IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:25-cr-218 (RDA) |
| | ) | |
| MICHAEL LOGAN BOURNE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND VERDICT**

This matter came before the Court for bench trial on the Government's charges against Defendant Michael Logan Bourne of: (i) two counts of sexual exploitation of a child in violation of 18 U.S.C. §§ 2251(a) and (e); and (ii) five counts of coercion and enticement of a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2422(b). A bench trial was held before the Court on December 8, 2025. Having carefully considered the evidence presented at trial and the arguments presented by counsel, the Court finds Defendant GUILTY on Counts 1, 3, 4, 5, 6, and 7 of the Indictment and NOT GUILTY on Count 2 of the Indictment.

## I. BACKGROUND

On April 24, 2025, a criminal complaint was filed against Defendant for a violation of 18 U.S.C. § 2422(b). Dkt. 1. On April 30, 2025, Defendant was arrested and had his initial appearance in this District. Dkts. 7, 8. On May 6, 2025, Defendant appeared for a detention hearing before a magistrate judge, and the Government's motion for detention was granted. Dkt. 14. After Defendant's arrest, the Government filed two consent motions to extend the time to indict the case, both of which were granted. Dkts. 21, 23.

Defendant later moved for reconsideration of the detention order. Dkt. 24. In the interim, Defendant was indicted on a seven-count Indictment. Dkt. 26. On July 29, 2025, Defendant had

a second hearing before the magistrate judge, who denied the motion for reconsideration. Dkts. 33, 34.

On August 8, 2025, Defendant appeared for an arraignment before now-retired U.S. District Judge Claude M. Hilton to whom this case was then assigned. Dkt. 35. Judge Hilton set the matter for trial on November 10, 2025, after Defendant waived his speedy trial rights. Dkts. 35, 36.

On August 28, 2025, Defendant filed a Motion to Suppress Evidence. Dkt. 37. On September 19, 2025, Defendant filed a Motion to Revoke the Detention Order. Dkt. 43. The Government opposed both motions. Dkts. 44, 50.

On October 6, 2025, this case was reassigned to this District Judge following Judge Hilton's retirement. On October 8, 2025, following a second waiver by Defendant of his speedy trial rights, this Court reset the trial in this matter for December 8, 2025. Dkts. 46, 47, 48. On October 22, 2025, this Court heard argument on the pending Motions to Revoke and to Suppress. Dkt. 53. On October 24, 2025, this Court issued two Memorandum Opinions and Orders denying the Motions. Dkts. 54, 55.

On October 31, 2025, Defendant filed a Motion to Waive Trial by Jury. Dkt. 58. On November 5, 2025, this Court held a hearing to voir dire Defendant's decision and, finding that Defendant's decision was knowingly and intelligently made, granted the motion. Dkts. 59, 60. After the matter was converted into a bench trial, the parties indicated that there was no need for a final pretrial conference in this case. Dkts. 62, 63.

On December 1, 2025, the Government filed its witness list, exhibit list, and eight stipulations to which the parties had agreed. Dkts. 68, 69, 70, 73. On December 3, 2025, Defendant filed Objections to several of the Government's Exhibits. Dkt. 75. On December 4,

2025, Defendant filed his own exhibit list. Dkt. 77. That same day, the Government filed its Response to Defendant's Objections. Dkt. 78.

On December 5, 2025, the parties filed their Trial Briefs. Dkts. 79, 80. On December 7, 2025, Defendant filed a Response to the Government's Trial Brief. Dkt. 82.

On December 8, 2025, a bench trial was held before this Court. During trial, Defendant moved for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure with respect to Counts 1 and 2 only. The Court took those matters under advisement.

## II. LEGAL STANDARD

"In a case tried without a jury, the court must find the defendant guilty or not guilty. If a party requests before the finding of guilty or not guilty, the court must state its specific findings of fact in open court or in a written decision or opinion." Fed. R. Crim. P. 23(c). "When . . . a jury trial is waived, the judge weighs the evidence, determines the credibility of the witnesses, and finds the facts." *United States v. Bales*, 813 F.2d 1289, 1293 (4th Cir. 1987); *see* 2 C. Wright, *Federal Practice and Procedure* § 374 (4th ed. 2020); *United States v. Kipp*, 2017 WL 2662983, at *2 (W.D.N.C. June 20, 2017) ("In a bench trial, the court's duty is to . . . choose from among conflicting inferences and conclusions those which the court considers most reasonable."). "The Court has wide discretion to select among conflicting inferences to be drawn from the testimony." *United States v. Higgins*, 2021 WL 342565, at *1 (W.D. Va. Jan. 31, 2021).

Here, notwithstanding the fact that the parties did not formally request an opinion, the Court provides its findings of fact and conclusions of law so that the parties may be aware of the basis for the Court's verdict.

## III. FINDINGS OF FACT

During its case in chief, the Government presented the testimony of one witness: FBI Special Agent Kelly McLeod. Based on the testimony and exhibits admitted through this witness, the Court makes the following findings:

In 2022, law enforcement launched an investigation after a parent in Arizona reported that their minor child was talking to and sending images to men online. The parties have stipulated that the minor, referred to by the parties as "Minor Victim 1" or "MV1," was born in 2008 and that her real name is known and agreed to by the parties. *See* GX 600. As part of the investigation, law enforcement subpoenaed Google for MV1's account information. Law enforcement then referred the results of that subpoena to various FBI field offices for further investigation, at which time Special Agent McLeod became involved in the investigation and, in particular, began investigating an email account (lordromance2021@gmail.com or the "LR Account") that was communicating with MV1.

As part of her investigation, Special Agent McLeod subpoenaed the Google subscriber records for the LR Account (GX 402) and then subpoenaed certain Comcast subscriber records related to IP addresses associated with the LR Account (GX 404). Those subpoenas led Special Agent McLeod to an address in Chantilly, Virginia, and the Defendant in this case. A search warrant was then obtained for the LR Account,[1] and later a search was conducted of Defendant's residence. The search warrant for the LR Account revealed that the LR Account user engaged in

---

[1] The parties have stipulated and agreed that the records produced in response to the subpoenas to Google and Comcast and the search warrant are true and accurate copies of records kept in the course of regularly conducted business. GX 607.

Google "chats" with six persons who identified themselves as minors.[2]  When law enforcement searched Defendant's residence, Special Agent McLeod and another FBI agent also interviewed Defendant.  During the search, law enforcement also seized, and later performed a forensic extraction on, an Apple iPhone 15 Pro Max and an HP Stream Laptop belonging to Defendant. GXs 604, 605.

### A.    *Chats with MV1*

In the chats with MV1, occurring in 2022, the LR Account user identified himself as David, and said he was in Virginia and 52 years old. GX 100-A. MV1 identified herself as being 13 and turning 14 at the end of the year. *Id.* The LR Account user initiated sexually explicit discussions with MV1, including explicit discussions where the LR Account user described MV1 performing various sex acts on him. GX 100-B.[3]  As part of these sexual discussions, the LR Account user would ask MV1 to appear on camera, asking "can I see you? as we share so much? on video cam?" *Id.* The LR Account user continued to pressure MV1 to appear on camera, despite her clear indications that she did not wish to do so. The LR Account user suggested that MV1 could watch him, but remain dressed herself, and then, alternatively, asked MV1 to describe how she touched

---

[2] Law enforcement was able to identify four of the minors in the chats and, in addition to MV1, the parties have stipulated and agreed that Minor Victim 2 ("MV2"), Minor Victim 4 ("MV4"), and Minor Victim 5 ("MV5") are minors with real names and dates of birth known to, and agreed to by, the parties.  GXs. 601, 602, 603.  The two other alleged minors identified themselves as minors but were not identified by law enforcement: Minor Victim 3 ("MV3") and Minor Victim 6 ("MV6").

[3] Those sexual discussions include, but are not limited to the following statements from the LR Account user: (i) "*peeing on you and getting so hard, wanting to f[***] you now so badly* can I have you?" GX 100-B; (ii) "do you want to suck my c[***] a little to drink down the last of my pee and then have me f[***] you," *id.*; (iii) "are you touching yourself for real? Getting so off?" *id.*; and (iv) "rub your p[***] more for me . . . do as I ask . . . rub it harder . . . feel My [sic] c[***] so much as you get so turned on sucking me, covered in My [sic] pee," *id.*  Additionally, the LR Account user sent MV1 images of his penis and asked her multiple times, "want to see more?" GX 100-E.

herself. *Id.* The LR Account user instructed MV1 to touch her genitals and described how he was "hard" and "touching" himself. *Id.*

Later in the chat, the LR Account user again attempted to persuade MV1 to join a video call. GX 100-C ("maybe I could call you now. . . . if you don't mind . . . . I'm SO hard . . . . and I just want you so much . . . *bites lip\**"). In so doing, the LR Account user offered to "show you how hard I am" and, when MV1 again suggested she did not want to do so, insisted "I am VERY visual so just seeing you as we chatted would be amazing." *Id.*[4] After persuading MV1 to agree on a time to video, the LR Account user instructed "you will be on cam for me" and "understood?" *Id.* He further told MV1 that she would do "whatever I tell you to do ; ) *tickles\**" and that she could "learn to be a good girl on cam for me" and to be "sweet and obedient and submissive." *Id.* The LR Account user offered to "teach you and guide you and tell you what to do." *Id.*

At the appointed time, the LR Account user sent MV1 a Google meeting link. GX 100-D. MV1 stated that she did not want to talk to him anymore, stating that she was "literally sad every

---

[4] At trial and pretrial, Defendant objected to the chats' inclusions of various statements by the minor victims. Dkt. 75. Defendant's objection pretrial was made only in very general terms and did not identify specific hearsay statements contained within the Government's exhibits. *Id.* And, as such evidence had not yet been offered, the objection was premature. *United States v. Rosen*, 520 F. Supp. 2d 802, 814 (E.D. Va. 2007) (holding that a hearsay objection was "premature" at the pretrial stage because the specific nature of the evidence offered was not known). At times during trial, Defendant raised more specific objections, and the Court recognized that Defendant had a standing objection that the Court would consider. Thus, the Court pays particular attention to the Court's reliance on any statements by the minor victims in its findings of fact.

Here, any hearsay objection is overruled, because the statements by MV1 regarding her desire not to appear on camera are relevant to show the effect that they had on the LR Account user. *United States v. Gallagher*, 90 F.4th 182, 195 (4th Cir. 2024) ("Such statements are not hearsay because their relevance does not depend on whether the declarant spoke the truth. Instead, they are admissible because they are offered to 'establish the state of mind thereby inducted' in the recipient or 'to show the information which [the recipient] had as bearing on the reasonableness [or] good faith . . . of subsequent conduct.'").

day" and "on the brink of tears." *Id.*[5]  Again, the LR Account user responded by pressuring MV1, insisting, "I think you can be open to me wanting to see you and talk a little about sex." *Id.*  Later, the LR Account user again initiated sexual fantasy by describing how MV1 would perform sex acts on him and would herself be naked for him.  GX 100-E.  As part of that sexually explicit discussion, the LR Account user sent MV1 explicit pictures of his penis and a video, which Special Agent McLeod testified showed the same person with his penis visible, masturbating.  *Id.*

The Court finds beyond a reasonable doubt that the LR Account user engaged in these messages to knowingly persuade, induce, entice, or coerce MV1 to engage in illegal activity.  The Court also finds beyond a reasonable doubt that the LR Account user proposed that MV1 feel or fondle her own genital parts, proposed the performance of a sexual act by MV1, and exposed his genitals to MV1.

### B.    *Chats with MV2*

MV2 is a minor whose real name and birth date, in 2005, are known to the parties.  GX 601.  At the time of MV2's chats with the LR Account user in 2022, MV2 was 16 and 17 years old.  Again, the LR Account user introduced himself as David, from Virginia.  GX 101-A.  The LR Account user began engaging MV2 in discussions of sexual fantasy.  GX 101-B.  Shortly after the chats were initiated, the LR Account user told MV2 that he loved her.  GX 101-C.  On April 22, 2022, MV2 sent the LR Account user a video link.  *Id.*  There is then a twenty-minute break in the chat, before the chat resumes with the LR Account user stating: "goodness," "my heart is still

---

[5] Any hearsay objection with respect to these statements is again overruled as these statements by MV1 are a "statement of the declarant's then-existing . . . emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)."  Fed. R. Evid. 803(3).  Because these statements fall within a hearsay exception, any objection on this basis is overruled.

pounding," "I have never felt so connected to anyone. . [sic] any age," and "you look so good cumming and getting so turned on." *Id.*

A few days later, the LR Account user sent MV2 a video meet up link. GX 101-D. In the chats immediately before the LR Account user sent the link, he was: (i) telling MV2, "I would so love to see you"; (ii) telling MV2, "I love you"; (iii) asking MV2, "do you love how I suck into the marks on your neck, reminding you that you belong to me?"; and (iv) calling her a "good girl." GX 101 at US-00011028 through US-00011030. About 45 minutes after the link was sent, the chat resumed with the LR Account user complaining that "the room completely froze up" and that "I could not type and you were no longer moving." GX 101-D. The LR Account user further complained "this laptop can only do that for so long before super lag." *Id.* The LR Account user later stated: "hate that my laptop lags up so bad . . [sic] loved seeing you . . . you look so good for daddy." *Id.* He further informed MV2, "daddy is still so hard for his good little princess." *Id.* After this interaction, MV2 expressed a concern that what they were doing was illegal, and the LR Account user instructed MV2 that he did "not want you to send me anything . . [sic] no pictures or anything naughty." *Id.*[6] The LR Account user emphasized that he "like[s] it when you are on cam[era] with Daddy . . . . I like controlling you, guiding your touch, and watching you feel Daddy more than anything and being teased." *Id.* From these chats, the Court finds beyond a reasonable doubt that the LR Account user sent MV2 the video call meet link for the purpose of transmitting a live video depiction of MV2 performing sexually explicit conduct. The Court further finds beyond a reasonable doubt that the LR Account user's chats with MV2 on April 25, 2022, and

---

[6] Again, MV2's statements are relevant for their effect on the listener and for the response that they draw from the LR Account user. *See Gallagher*, 90 F.4th at 195.

before were intended to entice, persuade, induce, and coerce MV2 into participating in such live video depiction and engaging in such sexually explicit conduct.

On April 29, 2022, the LR Account user told MV2 that it was "daddy's birthday today." GX 101-E.

In later chats, the LR Account user instructed MV2 to masturbate. GX 101-F. MV2 also asked whether the LR Account user would like to watch her take bath, to which the LR Account user responded "oh . . . f[***] . . Daddy would like that and would probably want to join you and make love to My [sic] good girl in the bath." GX 101-G.[7] Later, the LR Account user instructed MV2 to "start the room, princess." *Id.* This instruction was followed by a message from MV2 that reads, "No message content to display." *Id.* Special Agent McLeod credibly testified that she reviewed the original JSON text files and that, when she reviewed this specific chat, a meeting link was sent from MV2 to the LR Account user.[8] Approximately thirty minutes after MV2 sent the meet link, MV2 returned to the chat, apologizing that "[m]y mom almost caught me," to which the LR Account user replied, "it's ok." *Id.*[9] The Court finds beyond a reasonable doubt that the

---

[7] During the trial, MV2's question regarding the bath was objected to as hearsay. The Government responded that it was not a proper objection because it was a question – not a statement. Defendant then withdrew the objection.

[8] Special Agent McLeod testified JSON is a text file that includes the metadata of the chat and that the chats were converted from JSON text files to conversation chat view for ease of review. Special Agent McLeod testified that sometimes the JSON text did not easily convert, and, in those instances, Special Agent McLeod testified that she reviewed the underlying JSON text file to understand the missing content from the chat file. Specifically, with respect to this exchange, Special Agent McLeod testified that the metadata in the JSON text filed showed the video call link.

[9] Here, Defendant did not raise a specific objection with respect to this statement. In any event, any objection to MV2's statements would be overruled either as a present sense impression or adoptive admission. A present sense impression is a statement describing an event "made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). Here, MV2 is making the statement in the immediate aftermath of the video call being interrupted and providing an

9

LR Account user instructed MV2 to send the video call meet link for the purpose of transmitting a live video depiction of MV2 performing sexually explicit conduct. The Court further finds beyond a reasonable doubt that the LR Account user's chats with MV2 on and before May 2, 2022, were intended to, and did, entice, persuade, induce, and coerce MV2 into participating in such live video depiction and engaging in such sexually explicit conduct.

A few days later, MV2 sent a message that appears in the Government's exhibit as containing no content. GX 101-H. Again, Special Agent McLeod credibly testified that, in her review of the JSON text files, the message contained a video call link. Before MV2 sent that message, the LR Account user messaged: "I miss you" and "I crave you." GX 101 at US-00011177. Although the LR Account user indicated that he could not immediately join the call, MV2 left the video call open. GX 101-H. The LR Account user then told MV2, "I want to see you as I touch for you." *Id.* He later asked her: "did you cum watching daddy cum." *Id.* MV2 then inquired about the size of the LR Account user's penis, and he responded, "7.5 and very thick." *Id.* MV2 responded, "it looked like about 2 inches long." *Id.*[10] When the LR Account user objected to her observation, MV2 responded, "maybe it has to do with the angle of how the camera was," to which the LR Account user agreed, "maybe." *Id.*[11]

---

explanation for the interruption. Moreover, the statement is also an adoptive admission, because the LR Account user accepts MV2's statement (corroborating that the video call was interrupted) and responds, "it's ok." Fed. R. Evid. 801(d)(2)(B).

[10] Again, Defendant did not raise a specific objection with respect to this statement, but, in any event, it is admissible as a present sense impression.

[11] Again, Defendant did not raise a specific objection with respect to this statement, but, in any event, it is admissible as a present sense impression or as an adoptive admission. The LR Account user accepted MV2's explanation, that it was the angle of the camera during their video call that made his penis appear smaller than he believed it to be, when he said, "maybe." Thus, Defendant adopted the admission that his penis was exposed to MV2's view.

On December 7, 2022, after further discussions between the two, the LR Account user again sent MV2 a meeting video link and instructed her to "join Sir." GX 101-I. He then told MV2, "YOU ARE amazing" and "so gorgeous." *Id.*

The Court finds beyond a reasonable doubt that the LR Account user engaged in all of these messages to knowingly persuade, induce, entice, or coerce MV2 to engage in illegal activity. In particular, the Court finds beyond a reasonable doubt that the LR Account user used these messages to propose that MV2 fondle her own genitals, to propose performance of an act of sexual intercourse, and to expose his genitals to MV2.

### C.     *Chats with MV3*

MV3 is one of the two unidentified persons with whom the LR Account user chatted. In her chats with the LR Account user, MV3 refers to having "just turned 17." GX 102-J. MV3 also sent images that reflect a young, teenage girl. GX 102-G.[12] Additionally, the LR Account user sent messages indicating that he understood her to be under the age of 18. GX 102-A ("you need to be 18 young lady").

In chats with MV3, the LR Account user told her, "I don't want anyone but you," "I love you," and "I want you." GX 102-A. Later, the LR Account user sent MV3 images of his penis, sometimes covered by underwear and sometimes not. GX 102-A, GX 102-B. The LR Account user described this as "a growing bulge in Daddy's undies for a certain very kissable princess." GX 102-A. In another instance, the LR Account user sent the image of his penis telling MV3, "do you want to feel daddy again so badly." GX 102-B. As part of this exchange and following the

---

[12] The Court notes that the Defendant did not contest that MV3 was under the age of 18. Defense counsel asserted in opening and closing that for the two Section 2251 charges, the defense was only contesting one of the elements of the offense, namely that he engaged in conduct for the purpose of producing a live visual depiction of sexually explicit conduct.

LR Account user's descriptions of the sexual acts in which he would like to engage with MV3, the LR Account user asked MV3 to join a video chat with him. GX 102-B ("mmmm . . . can I see you while you ride daddy? in a google room?"). MV3 declined.

A few months later, following additional sexual discussions, the LR Account user told MV3, "mmmm Daddy missed you," before sending her another image of his penis. GX 102-C. He then asked her whether she wanted to see more, and without waiting for a response, sent another image of his penis. *Id.*

Later, MV3 instructed the LR Account user to "Rejoin!!" GX 102-D. The LR Account user responded, "coming." *Id.* Fifty minutes passed before the chat resumed. *Id.* The LR Account user then thanked MV3 and told her, "I love hearing you and seeing you," and that he "love[s] knowing I make you feel that good." *Id.* In addition to noting that he loved seeing MV3, the LR Account user indicated that he hoped she enjoyed "hearing and seeing Daddy so much." *Id.*

In describing what he enjoyed regarding his interactions with MV3, the LR Account user intermixed interactions that are potentially real with interactions that are clearly fantasy. GX 102-E (describing "3 things that make Daddy the hardest and happiest when it comes to His [sic] good little girl and cam," which include seeing her kneeling but also include "seeing her sucking on daddy's c[***]"). Later, the LR Account user told MV3 that she "is the most beautiful teenager I have ever seen" and that she is beautiful "dressed and naked." GX 102-F.

The following month, after a discussion of how much "Daddy loves you," the LR Account user stated, "I miss you and want to see you so badly." GX 102-G. In response, MV3 sent a "meet.google.com" video link. *Id.* Shortly thereafter, MV3 indicated that she was interrupted ("BRB. Parents"), and the LR Account user acknowledged and accepted the interruption ("ok").

*Id.*[13] When the chat resumed about an hour later, the LR Account user told MV3, "that was unreal," and that "I loved seeing you so much," and that "Daddy came So [sic] hard." *Id.* MV3 then stated, "I'm still naked." *Id.*[14]

The following month, the LR Account user, as part of his sexual discussions with MV3, told her that "you are Mine [sic] forever" and then demanded to "let Daddy see you . . [sic] please your Daddy." GX 102-H. MV3 agreed, and the LR Account user told her that she was a "good girl" and that she was "Daddy's." *Id.* MV3 responded by sending a "meet.google.com" video link. *Id.* About ten minutes later, the LR Account user then told MV3, "I hope you didn't get into trouble," and that "you are so hot." *Id.* He then repeatedly stated that he "love[s] watching you cum so hard for Daddy" and also said that he "love[s] watching you touch." *Id.* In the same discussion, the LR Account user stated, "I have only seen you squirt once . . . I still can't forget it," and described seeing her "on the floor . . [sic] naked . . [sic] on a towel . . . my god . . . it was and has been the hottest and most amazing thing I have ever seen and shared." GX 102-J.

With respect to himself, the LR Account user stated that he was "52 . . . going to be 53 in April." GX 102-J. When asked his birthday, the LR Account user responded "April 29th." GX 102-K.

---

[13] Again, Defendant made no specific hearsay objection with respect to this statement, but any such objection would nonetheless be overruled on the basis of present sense impression or adoptive admission.

[14] Again, Defendant made no specific hearsay objection with respect to this statement, but any such objection would nonetheless be overruled on the basis of present sense impression or as a then-existing physical condition. Fed. R. Evid. 803(1), 803(3).

D.      *Chats with MV4*

MV4 is a minor whose real name and birth date, in 2007, are known to the parties.  GX 602.  At the time of MV4's chats with the LR Account user in 2022, MV4 was 14 and 15 years old.

With respect to MV4, the LR Account user developed a relationship whereby they referred to each other as master and slave.  GX 103-A.  The LR Account user expressed excitement to "actually see you" and then sent MV4 a "meet.google.com" video link.  *Id.*  The LR Account user said, "so good seeing you," and reiterated, "I love you so much," and "you are Mine [sic] and I am never letting you go."  *Id.*  He later sent a second "meet.google.com" video link.  *Id.* MV4 also sent the LR Account user a link.  *Id.*  Approximately fifteen minutes later, the LR Account user told MV4, "you are so f[******] hot omg."  *Id.*  He engaged in further sexual discussions with MV4 and was later interrupted by a message from MV4's mother informing him to stop communicating with MV4 and that his messages would be given to the sheriff's department.  *Id.*[15] Nonetheless, the LR Account user told MV4 in response to the comments from her mother: "I will never block you or not be here.  Never."  GX 103-B.  He continued to reiterate, "you will always and forever belong to Me [sic]."  *Id.*  Following this discussion, the LR Account user asked, "can Master see you slave," and "want to set up a meet room slave?"  *Id.*  The LR Account user told MV4 to "go ahead then slave . . [sic] send Master the link," and she did.  *Id.*  The LR Account user told MV4, "it was great to see you," and that he "wish[es] I could control you and have my way

---

[15] Again, Defendant made no specific hearsay objection with respect to this statement, but any such objection would nonetheless be overruled because it is admissible to show the effect on the listener.

with you." *Id.* In another message, the LR Account user stated: "I just closed the room . . [sic] did you go back in? Did you want to try to please Master quickly?" *Id.*

In each of the excerpts of the chats with MV4 presented by the Government, the LR Account user also described various sex acts that he wanted MV4 to perform with him. GX 103-A, 103-B, 103-C.[16]

The Court finds beyond a reasonable doubt that the LR Account user engaged in these messages to knowingly persuade, induce, entice, or coerce MV4 to engage in illegal activity. In particular, the Court finds beyond a reasonable doubt that the LR Account user used these messages to propose that MV4 engage in an act of sexual intercourse.

### E.    *Chats with MV5*

MV5 is a minor whose real name and birth date, in 2008, are known to the parties. GX 603. At the time of MV5's chats with the LR Account user in 2022, MV5 was 13 years old.

In his messages, the LR Account user described various sex acts that he would perform on MV5 or that he desired she perform on herself. GX 104.[17] The LR Account user also asked her to appear on video so he could see her performing those acts. *Id.* ("could I see you on video as I am making you so wet . .[sic] no sound . .[sic] before you head off to school"). After she did not

---

[16] Those sexual discussions include, but are not limited to the following statements from the LR Account user: (i) "only My [sic] c[***] will take your flower . . . you know that right? There is only 1 c[***] allowed in your virgin p[***]. . Master's. Master will be your first and only," GX 103-A; (ii) "did you want to try to please Master quickly?" GX 103-B; (iii) "gripping your hps [sic] and f[******] you so good and deep from behind," GX 103-C; and (iv) "I love f[******] My tight sexy young slave," *id.*

[17] Those sexual discussions include, but are not limited to the following statements from the LR Account user: (i) "slipping a finger inside you and pushing it deep, wanting make you even more wet, fingering you softly," GX 104; (ii) "I hope at least you can touch that wet p[****] for real for me as I finger you so gently as you grind on my hand," *id.*; (iii) "are you very wet and rubbing that wet p[****] for me," *id.*; and (iv) "are you rubbing that soft wet p[****]," *id.*

respond, the LR Account user instructed her to "touch that wet p[****] for real for me." *Id.* Later she told him that she did not have experience, and the LR Account user instructed her to masturbate. *Id.* The LR Account user informed MV5, "I still want to see you on video sometime." *Id.* In response, MV5 sent the LR Account user a series of images that display her partially nude and in provocative poses, in which she looks like the 13-year-old girl that she is. *Id.* He then told her, "you are very sexy." *Id.* When she told him that she was 13, he responded, "damn . . [sic] nice p[****] and breasts and everything for your age." *Id.*

The Court finds beyond a reasonable doubt that the LR Account user engaged in these messages to knowingly persuade, induce, entice, or coerce MV5 to engage in illegal activity. In particular, the Court finds beyond a reasonable doubt that the LR Account user used these messages to propose that MV5 fondle her own genitals, to propose performance of an act of sexual intercourse, and to propose that MV5 expose her genitals to him.

F.    *Chats with MV6*

MV6 is the other unidentified person with whom the LR Account user chatted. In the chats, the LR Account user reflected his understanding that MV6 was "14 in the UK." GX 105. She affirmed that she was 14. *Id.* She also sent images which are consistent with MV6 being a young, minor teenager. *Id.*

Again, in these chats, the LR Account user tried to develop a master and slave relationship between himself and MV6. GX 105. He also emphasized that he wanted to appear on camera and asked, "you are willing to be on cam for Sir? You understand your place?" *Id.* The LR Account user instructed MV6 to let him know when she was in her room alone. *Id.* The LR Account user later asked, "are you in your room alone, kitten?" and then asked, "can you be? so I can see you and start to teach you?" *Id.* Over the course of the messages, the LR Account user again asked,

16

"are you finally in your room alone for Sir, kitten?" *Id.* He informed her, "Sir still wants to see you . . [sic] you are very very pretty." *Id.* He complained, "you always have an excuse as to why I cannot see you." *Id.* The LR Account user reminded her, "Sir still hasn't seen you on cam yet kitten," and asked, "can that happen today maybe?" *Id.* He sent her a message about the sexual things that he wanted to do to her. *Id.* In response, MV6 sent the LR Account user a nude image of her genitals posed in a provocative manner. *Id.* The image confirms that MV6 is a young teenager and even includes a stuffed animal on the bed beside her. *Id.* The LR Account user informed her, "you are so sexy," and again asked, "can I see you on cam?" *Id.* Then the LR Account user again started describing the sexual acts that he would like MV6 to perform on herself or that he would like to perform on her. *Id.* MV6 then sent a second image of herself sticking out her tongue and a partially nude picture showing her breasts and underwear while provocatively posed. *Id.* The LR Account user then attempted another call and, when it did not connect, the LR Account user complained, "come on kitten . . . it's time you obeyed and served your Sir. . . join the call and let me have you." *Id.*[18]

The Court finds beyond a reasonable doubt that the LR Account user engaged in these messages to knowingly persuade, induce, entice, or coerce MV6 to engage in illegal activity. In particular, the Court finds beyond a reasonable doubt that the LR Account user used these messages to propose that MV6 fondle her own genitals, to propose performance of an act of sexual intercourse, and to propose that MV6 expose her genitals to him.

---

[18] Those sexual discussions include, but are not limited to the following statements from the LR Account user: (i) "taking you to bed and starts to f[***] you very passionately, laying you down naked and f[******] your young wet p[****], taking you so deep and hard," GX 105; (ii) "feel me f[******] you so good? Sliding in and out of that tight small p[****] so hard and deep," *id.*; and (iii) "you are not shy to show Sir your soft naked p[****]," *id.*

G.     *The LR Account User is Defendant*

As Special Agent McLeod testified, an IP address is a unique number that is affiliated with a device once it accesses a network like the internet. She testified that the FBI looks through materials like account information for IP addresses and then subpoenas the internet service provider for the subscriber information associated with that IP address. The FBI made such a request here. GX 404. The FBI identified two IP addresses associated with the LR account and made a request to Comcast for the subscriber information. *Id.* Comcast responded that the information for the two LR Account user IP addresses returned to Defendant Michael Logan Bourne in Chantilly, Virginia. *Id.*

As part of the materials provided in connection with the LR Account, the FBI reviewed a number of photographs (colloquially referred to as "selfies") that were found in the LR Account. GX 300 through GX 312. Special Agent McLeod identified the person in the selfies as the Defendant, Michael Logan Bourne. Furthermore, it is clear to the Court from viewing the Defendant in the courtroom during trial and from viewing GX 300 through GX 312 that the photographs are of Defendant—each photograph shows Defendant's face. Some of the photographs show Defendant wearing a hat or glasses, but in each instance the photograph is clearly of Defendant. The metadata on the bottom of each image indicates that the source of the image is "lordromance2021@gmail.com." GX 300 through GX 312.

Special Agent McLeod attended a search of Defendant's residence in Chantilly, Virginia, during which the FBI collected various photographs of the residence and, in particular, Defendant's home office. Special Agent McLeod testified that she recognized that the desk in Defendant's home office appeared similar to the background of images sent in the LR Account user chats. In particular, Special Agent McLeod noted the tan desk, with the black mat underneath,

18

and the blinds behind. GX 234 (showing Defendant's home office). Special Agent McLeod noted that the tan desk and the edge of a black mat appear in some images retrieved from the LR Account, and that the white blinds are visible behind Defendant and/or the image of a penis in other images retrieved from the LR Account. GX 313. In particular, images 6, 17, 18, and 34 show the black mat and the legs or underside of a tan desk. *Id.* And images 10, 12, 13, 24, 37, and 38 show Defendant positioned in front of white blinds. *Id.* Special Agent McLeod testified that GX 313 is a compilation of images found in the LR Account.

As previously indicated, during the search of Defendant's home, the FBI seized an Apple iPhone from Defendant. GX 604. The FBI retrieved from the Apple iPhone a number of images, some of which were presented as a compilation in GX 314. GX 314; *see also* GX 605 (stipulating to the forensic extraction performed on the Apple iPhone). In her review of the images, Special Agent McLeod noted that many of images found on Defendant's Apple iPhone were similar to the images found in the LR Account. *Compare* GX 313 *with* GX 314.

The FBI also extracted a number of images from Defendant's laptop. GX 604; GX 605. Special Agent McLeod compared some of the images extracted from the laptop to those images in the LR Account. In particular, in GX 316-A, Special Agent McLeod compared images of a person grabbing his penis over what appears to be pajama pants. Special Agent McLeod pointed out that the metadata associated with each image revealed that image on the left (labelled US-00009165) was retrieved from the LR Account and the image on the right (labelled US-00006064) was retrieved from Defendant's laptop.

The FBI also extracted some messages from Defendant's Apple iPhone and compared them to messages from the LR Account. In GX 319, there is a message from Defendant's iPhone on April 22, 2022, indicating he was "Done with Michaels. Heading to wegmans." GX 319. On the

19

same date and within approximately six minutes of the iPhone message, the LR Account user tells MV2 he is "walking through wegmans thinking of you." *Id.* Similarly, in GX 324, Special Agent McLeod noted that, on May 11, 2022, the LR Account user was communicating with MV2 at 8:41 p.m. GX 324. Special Agent McLeod also testified that the exhibit shows another communication recovered from the LR Account on the same date and roughly the same time, with a different person (reflected in US-00005951), wherein the LR Account user sends a video that depicts the Defendant, Michael Logan Bourne.[19] Special Agent McLeod further testified that GX 331 reflects that, at the same time the LR Account user was chatting with MV3 about moving, Defendant was messaging in his Apple iPhone that he was moving. GX 331 (reflecting the LR Account user discussing moving on November 1, 2022, and Defendant discussing moving on October 28 and November 1, 2022); GX 332 (calendar entry from Defendant's Apple iPhone reflecting that he was moving on October 29, 2022). Special Agent McLeod also testified that the LR Account user and Defendant searched for many of the same websites in their browser queries. GX 333; GX 334; GX 335.

Special Agent McLeod also testified that she learned that Defendant prefers to go by his middle name, Logan, and that Defendant's wife is Jillian. Special Agent McLeod testified that, in the LR Account, the FBI recovered an email attachment titled "Christmas 2022-Coach," which appeared to be a short story involving Logan and Jillian. GX 343. A Microsoft Word version of

---

[19] Defendant objected to the admission of GX 324 on the basis that the Government was speculating that the video reflecting Defendant was ever sent to the persons with whom the LR Account user was communicating. Special Agent McLeod, however, credibly testified that the reviewed the underlying link in the chat with the other person (reflected in US-00005951) and that the link connected to the video of Defendant. Thus, the objection was appropriately overruled. To the extent that Defendant was objecting on the basis that the video was not sent to one of the minor victims specified in the Indictment, Defendant's objection is not well taken; the fact that the LR Account user sent a video of Defendant is relevant to Defendant's identity as the LR Account user.

"Christmas 2022-Coach" was recovered from Defendant's laptop. *Id.* Moreover, Special Agent McLeod testified that the creator of both documents, according to the metadata, was Michael Bourne. *Id.*; *see also* GX 343-A. Special Agent McLeod also testified that the LR Account user was emailing with logan.bourne@nearshoretechnology.com, and that she recovered documents at Defendant's residence purporting to come from Nearshore Technology. GX 336; GX 342.[20]

Finally, after Special Agent McLeod interviewed Defendant during the search of his residence, she learned additional information connecting him to the LR Account. As part of her investigation, Special Agent McLeod learned that Defendant's birthday is April 29, and, in his chats, the LR Account user makes several references to his birthday being on April 29. GX 101-E; GX 102-K; GX 324. Special Agent McLeod also confronted Defendant with the pictures that she recovered from the LR Account, including the pictures of male genitalia. In response, Defendant replied, "that's definitely my hand," "that's me," and "I definitely took it." GX 506-A.[21] He further admitted to owning pants and shorts like those depicted in the images and further reiterated, "I'm not denying I took" the picture. *Id.* When asked about chatting, Defendant admitted to doing so on his laptop and stated that his "laptop is trash" and that it is "slow as a dog." *Id.* The LR Account user similarly complained about his laptop. *See, e.g.*, GX 101-D (complaining to MV2 that the "room completely froze up," that "this laptop can only do that for so long before

---

[20] GX 342 is not considered for the truth of the matter asserted – that Defendant worked at Nearshore Technology or that the payment information included is correct. Rather, it was admitted for the purpose of supporting that Special Agent McLeod discovered that there was a connection between Defendant and Nearshore Technology. *See United States v. Edelen*, 561 F. App'x 226, 235 (4th Cir. 2014).

[21] Although the Government listed transcripts of the audio recordings of the interview with Defendant as exhibits, they did not introduce those exhibits as evidence. *See* Dkt. 83-1. Accordingly, the quotes of the interview included here are based upon the Court's review of the evidence and may not be an exact transcription.

21

super lag," and "hate that my laptop lags up so bad"). In the interview with the FBI, Defendant also admitted to chatting on Google and 321Chat (another browser) and that his chats were sexual in nature, such that he would delete photographs so that his wife would not see them. GX 506-A. Upon further questioning regarding his chats, Defendant also admitted that the photographs that the FBI discovered were sent in real time. GX 515-A (Q: "Anytime there's a picture within the chat that was taken on your phone?" A: "Yes. And that's real time within the chat."); *id.* ("What I would send to them, its real time.").

Based on all of the above, the Court finds beyond a reasonable doubt that Defendant is the LR Account user.

## IV. CONCLUSIONS OF LAW

Defendant stands charged with seven counts in the Indictment, which can be grouped into violations of two statutes: (i) Counts 1 and 2 allege attempted and/or completed violations of 18 U.S.C. § 2251(a) relating to MV2 and MV3; and (ii) Counts 3, 4, 5, 6, and 7 allege violations of 18 U.S.C. § 2422(b) involving MV1, MV2, MV4, MV5, and MV6. The Court will address each Count below.

### A.    Section 2251(a)

The Court begins by reciting the law applicable to a Section 2251(a) offense. The Government must prove beyond a reasonable doubt three elements: (1) that the victim was less than 18 years old; (2) that Defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct or for the purpose of transmitting a live visual depiction of that conduct; and (3) that Defendant knew or had reason to know that such visual depiction would be or had been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting

22

interstate or foreign commerce. *United States v. Malloy*, 568 F.3d 166, 169 (4th Cir. 2009); *United States v. McCauley*, 983 F.3d 690, 695 n.3 (4th Cir. 2020); 18 U.S.C. § 2251(a).

The terms "persuade," "induce," and "entice" are not statutorily defined, but they are to be given their "ordinary meaning" and are "effectively synonymous," conveying the idea "of one person leading or moving another by persuasion or influence, as to some action [or] state of mind." *United States v. Engle*, 676 F.3d 405, 411 n.3 (4th Cir. 2012). "Sexually explicit conduct" is statutorily defined as, *inter alia*, "sexual intercourse," "masturbation," and "lascivious exhibition of the anus, genitals, or pubic area of any person." 18 U.S.C. § 2256(2)(A). The second element of Section 2251(a) also requires that the production of a visual depiction or transmission of a live visual depiction be "the purpose" or "a significant" or "motivating" purpose of the sexual activity, *McCauley*, 983 F.3d at 695-97; that is, the Government must draw the distinction between a "significant" purpose and a "merely incidental" purpose, but need not show that a defendant acted for the sole purpose of producing a visual depiction or transmitting a live visual depiction. *See United States v. Sanders*, 107 F.4th 234, 260 (4th Cir. 2024).

An indictment may also charge both attempt and a completed crime in a single count, so long as it is clear on which theory any conviction is based. *See United States v. Hewlett*, 467 F. Supp. 3d 347, 358-59 (E.D. Va. 2020). As the Fourth Circuit has consistently held, "[a]n attempt to commit a crime, which is recognized as a crime distinct from the crime intended by the attempt, punishes conduct that puts in motion events that would, from the defendant's point of view, result in the commission of a crime but for some intervening circumstance." *United States v. Engle*, 676 F.3d 405, 419 (4th Cir. 2012) (citing *United States v. Pratt*, 351 F.3d 131, 135 (4th Cir. 2003)). To convict a defendant of attempt, the Government must prove beyond a reasonable doubt that: (i) he had culpable intent to commit the crime and (ii) he took a substantial step towards completion

of the crime that strongly corroborates that intent. *Id.* at 420 (citing *United States v. Neal*, 78 F.3d 901, 906 (4th Cir. 1996)).

### i.    Count 1 – MV2

With respect to Count 1, the Government has charged both an attempt and a completed violation of Section 2251(a) between April 21, 2022, and April 18, 2023. Dkt. 26 (charging "attempted to and did"). In his trial brief and in opening and closing, Defendant suggested that Defendant was only contesting one of the elements necessary to prove a Section 2251(a) offense – the element related to the enticement taking place *for the purpose* of producing a visual depiction or visual transmission.[22] Nonetheless, the Court finds that the Government has met its burden to prove each element of Section 2251(a) beyond a reasonable doubt.

To begin with, the Court finds beyond a reasonable doubt that MV2 is a minor and is under the age of 18. GX 601 (identifying MV2's real name and date of birth). As indicated *supra*, the Court also finds beyond a reasonable doubt, based on all of the attribution evidence presented by the Government, that Defendant was the LR Account user communicating with MV2 in the chats reflected in GX 101 and in the chat excerpts GX 101-A, GX 101-B, GX 101-C, GX 101-D, GX 101-E, GX 101-F, GX 101-G, GX 101-H, and GX 101-I. There is also no dispute with respect to the interstate commerce element because it is undisputed that the chats and the meet links were sent using the internet. *See United States v. Kuehner*, 2023 WL 1422310, at *8 (E.D. Va. Jan. 31,

---

[22] To clarify, Defendant suggested that "the government will not be able to meet its burden to show that the minors engaged in 'sexually explicit conduct' for purposes of producing a 'live visual depiction.'" Dkt. 79 at 2. This does not accurately describe the Government's burden. Elsewhere in Defendant's Trial Brief, Defendant correctly acknowledged that the Government must show that: "defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in *sexually explicit conduct* for the purpose of producing a *visual depiction* of that conduct." *Id.* (emphasis in original). That is – it is Defendant's purpose that is central to the question of a Section 2251 offense.

24

2023) ( "Use of the internet satisfies the interstate commerce element of § 2251(a)."), *aff'd*, 126 F.4th 319 (4th Cir. 2025), *cert. denied*, 145 S. Ct. 2762 (2025); *see also United States v. Miltier*, 882 F.3d 81, 87 (4th Cir. 2018) (holding that "use of the internet in the transmission of child pornography satisfies the interstate commerce element" of receipt of child pornography under 18 U.S.C. § 2252A(2)(A)).

The Court now turns to the disputed element: whether Defendant used, employed, persuaded, induced, enticed, or coerced the minor to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct or for the purpose of transmitting a live visual depiction of that conduct. Here, the Court finds beyond a reasonable doubt that Defendant did. On April 25, 2022, Defendant told MV2 "I would so love to see you," "I love you," and that she was a "good girl." GX 101 at US-00011028 through US-00011030. Defendant had also previously described to MV2 various sexual behaviors in which he wanted to engage with her. Indeed, there are pages of chats in the three days immediately preceding April 25, 2022, in which Defendant engaged in extensive sexual discussions with MV2. GX 101 at US-00010979 through US-00011093 (reflecting more than one hundred pages of chats over three days). Defendant then sent MV2 a video call meeting link on April 25, 2022, at 3:42 a.m. GX 101-D. The Court finds beyond a reasonable doubt that these chats and others[23] show that Defendant sent MV2 the video

---

[23] Particular to MV2 and the exchange on April 25, 2022, Defendant told her, "I would so love to see you" before sending her the video link. GX 101 at US-00011028. And, throughout all of the chats, Defendant indicated that his purpose in talking to all of these girls was to have them appear on a live video performing sexual acts. *See, e.g.*, GX 100-B (asking MV1 to appear on camera, "can I see you? as we share so much? on video cam?"); GX 100-C (telling MV1, "maybe I could call you now. . . . if you don't mind . . . . I'm SO hard . . . . and I just want you so much . . . *bites lip*"); *id.* (telling MV1, "you will be on cam for me" and "understood?"); *id.* (telling MV1, "I am VERY visual so just seeing you as we chatted would be amazing"); GX 101-G (telling MV2, "I want to see you as a I touch for you"); GX 101-I (sending MV2 a video link and instructing her to "join Sir"); GX 102-B (telling MV3, "mmmm . . . can I see you while you ride daddy? in a google room?").

25

call meet link for the purpose of transmitting a live video depiction of MV2 performing sexually explicit conduct.[24] The Court further finds beyond a reasonable doubt that Defendant's chats with MV2 on April 25, 2022, and before were intended to, and did, entice, persuade, induce, and coerce MV2 into participating in such live video depiction and engaging in such sexually explicit conduct.

The question then remains whether, on this occasion on April 25, 2022, the Court can find beyond a reasonable doubt that there was a video of MV2 performing sexually explicit conduct sufficient to satisfy the statutory definition in 18 U.S.C. § 2256(2). On this occasion, the transmission was interrupted. Defendant states "that his laptop froze up" and that "this laptop can only do that for so long before super lag." GX 101-D. This is sufficient to establish attempt beyond a reasonable doubt. That is, Defendant had culpable intent to commit the crime – he had the purpose of enticing, coercing, and persuading MV2 and did so entice, coerce, and persuade her – and he took a substantial step towards the completion of the crime – he told MV2 he wanted to see her after discussing all the sexual acts that he wanted to perform on her or have her perform on herself and he sent her a video meet link. Indeed, the evidence shows beyond a reasonable

---

[24] The Court notes with respect to all of the counts charged in the Indictment that "[s]exual abuse of minors 'can be accomplished by several means and is often carried out through a period of grooming.'" *United States v. Engle*, 676 F.3d 405, 412 (4th Cir. 2012) (citing *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011)). "Grooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity." *Id.* Sections 2422(b) and 2251(a) "target[ ] the sexual grooming of minors as well as the actual sexual exploitation of them." *Id.* (citing *United States v. Berg*, 640 F.3d 239, 252 (7th Cir. 2011)); *see also United States v. Lee*, 603 F.3d 904, 915 (11th Cir. 2010) ("Much of Lee's conduct—especially his sending graphic photographs to the girls and promising gifts—also supports a finding that he groomed the girls in an effort to facilitate a future sexual encounter."); *United States v. Brand*, 467 F.3d 179, 203 (2nd Cir. 2006) (holding that the defendant's "sexual advances and grooming behavior provide additional evidence in support of the jury's finding that [he] attempted to entice a minor"). The Court finds beyond a reasonable doubt that Defendant, by way of his chats, was grooming each of the minor victims.

doubt that both MV2 and Defendant clicked on the link to join the video transmission. This is sufficient for attempt. *See Engle*, 676 F.3d at 419. The Court need not determine how far Defendant and MV2 went or what specific acts MV2 engaged in before Defendant's laptop interrupted the chat. *See United States v. Buculei*, 262 F.3d 322, 328 (4th Cir. 2001) ("That Buculei was unsuccessful in his attempt to actually produce a visual depiction of sexually explicit conduct, with Megan as its star, does not, therefore, require his acquittal on Count Two, that he violated § 2251(a).").[25] Thus, the Court finds beyond a reasonable doubt that Defendant attempted to violate Section 2251(a) on April 25, 2022, with respect to his chats and video meeting with MV2. Accordingly, the Court finds Defendant guilty on Count 1.

After this attempt, Defendant again emphasized that he "like[s] it when you are on cam[era] with Daddy . . . . I like controlling you, guiding your touch, and watching you feel Daddy more than anything and being teased." GX 101-D. Then, on May 2, 2022, MV2 asked whether Defendant would like to watch MV2 in the bath, and Defendant responded that he "would like that." GX 101-G. After a brief interlude wherein Defendant indicated that Defendant was unavailable, Defendant returned to the chat and instructed MV2 to "start the room, princess." *Id.* This is instruction was followed by a message from MV2 that reads, "No message content to display." *Id.* Special Agent McLeod credibly testified that she reviewed the original JSON text files and that, when she reviewed this specific chat, a meeting link was sent from MV2 to the LR Account user. This chat is also interrupted. *Id.* The Court finds beyond a reasonable doubt that the LR Account user instructed MV2 to send the video call meet link for the purpose of

---

[25] Other Circuits have similarly recognized that difficulty discerning whether an image meets the requirements of sexually explicit conduct does not preclude a conviction under Section 2251(a). *See, e.g., United States v. Al-Awadi*, 873 F.3d 592, 601 (7th Cir. 2017) ("That it may be difficult for some viewers to tell from the pictures alone which part of the body is depicted does not preclude conviction here.").

27

transmitting a live video depiction of MV2 performing sexually explicit conduct. The Court further finds beyond a reasonable doubt that the LR Account user's chats with MV2 on and before May 2, 2022, were intended to, and did, entice, persuade, induce, and coerce MV2 into participating in such live video depiction and engaging in such sexually explicit conduct.

Defendant is again correct that the Court cannot determine what exactly happened on the video link transmission. But, again, the transmission was interrupted. The facts as found by this Court are sufficient to establish attempt beyond a reasonable doubt. That is, Defendant had culpable intent to commit the crime – he had the purpose of enticing, coercing, and persuading MV2 and did so entice, coerce, and persuade her – and he took a substantial step towards the completion of the crime – he told MV2 he liked seeing her on camera, that he wanted to see her in the bath, and instructed her to "start the room." MV2 obeyed that instruction. This is sufficient for attempt. *See Engle*, 676 F.3d at 419. The Court need not determine how far Defendant and MV2 went or what specific acts MV2 engaged in before the chat was interrupted. *See Buculei*, 262 F.3d at 328 ("That Buculei was unsuccessful in his attempt to actually produce a visual depiction of sexually explicit conduct, with Megan as its star, does not, therefore, require his acquittal on Count Two, that he violated § 2251(a)."). Thus, the Court finds beyond a reasonable doubt that Defendant attempted to violate Section 2251(a) on May 2, 2022, with respect to his chats and video meeting with MV2. Accordingly, this provides a separate basis on which the Court finds Defendant guilty on Count 1.

### ii.    Count 2 – MV3

Because MV3 is one of the two persons that the Government has been unable to identify, the Indictment charges Count 2 as an attempted violation of Section 2251(a). Dkt. 26. Courts of appeals recognize that a defendant may be convicted of an attempt where he believes that the other

28

individual is a minor. *See, e.g., United States v. Johnson*, 376 F.3d 689, 693 (7th Cir. 2004) ("The offense for which Johnson was charged was the attempt to manufacture child pornography, and, as discussed below, an attempt requires that the defendant believe that the intended performer is a minor."); *United States v. Jayavarman*, 871 F.3d 1050, 1057 (9th Cir. 2017) ("We conclude that a person may be convicted for attempting to commit the crime charged in Count 1B if he believed that the victim was a minor, even if the victim was not in fact a minor."); *United States v. Caniff*, 955 F.3d 1183, 1186 (11th Cir. 2020) ("The offenses required the Government to prove, not that there was an actual child victim, but that Caniff believed he was texting with a minor."). Here, the Court finds beyond a reasonable doubt that Defendant believed that he was chatting with a minor. *See* GX 102-J ("I just turned 17."); GX 102-F ("you are the most beautiful teenager I have ever met"); GX 102-A ("once you're old enough" and "you need to be 18 young lady"); GX 102-G (MV3 sent images of herself wherein she appears to be a minor).

As indicated *supra*, the Court also finds beyond a reasonable doubt, based on all of the attribution evidence presented by the Government, that Defendant was the LR Account user communicating with MV3 in the chats reflected in GX 102 and in the chat excerpts GX 102-A, GX 102-B, GX 102-C, GX 102-D, GX 102-E, GX 102-F, GX 102-G, GX 102-H, GX 102-I, GX 102-J, and GX 102-K. There is also no dispute with respect to the interstate commerce element, because it is undisputed that the chats and the meet links were sent using the internet. *See Kuehner*, 2023 WL 1422310, at \*8 (recognizing "use of the internet satisfies the interstate commerce element of § 2251(a)").

Again, the central dispute with respect to Count 2 is whether Defendant used, employed, persuaded, induced, enticed, or coerced MV3 to take part in sexually explicit conduct for the

purpose of producing a visual depiction of that conduct or for the purpose of transmitting a live visual depiction of that conduct, and ultimately whether there was a visual depiction.

The Government first relies on an interaction that occurred on January 9, 2023. GX 102-D. In that instance, *MV3* instructs Defendant to "Rejoin" a video link. GX 102-D. Defendant later states, "I loved hearing you and seeing you." *Id.* He further states, "you are beautiful and sexy," and that "I love every part of your young sexy ass naked body." *Id.* Although the Court could perhaps find that Defendant's entire course of conduct with MV3 was intended to entice, coerce, or persuade MV3 to engage in sexual conduct on video, the Court cannot specifically say that his interactions on *this* occasion were so intended. In contrast to the two interactions with MV2, which the Court found sufficient to satisfy the Government's burden, here it was MV3 who initiated the video session between herself and Defendant. *Contrast* GX 102-D (MV3 instructing Defendant to "Rejoin"), *with* GX 101-D (Defendant sending MV2 the meeting link), *and* GX 101-G (Defendant instructing MV2 to "start the room"). Thus, it is difficult for the Court to determine that with respect to this specific video call, Defendant acted with the purpose of *enticing, coercing, or persuading* MV3 to engage in sexually explicit conduct *on video*. Whether an alleged victim acted spontaneously or in response to persuasion by the defendant is a core issue going to this element of the offense. *See, e.g.*, *United States v. Sanders*, 107 F.4th 234, 257 (4th Cir. 2024) ("[T]he terms employ, persuade, induce, entice, and coerce reach various types of external pressure that a defendant might apply on a minor to get him or her to engage in sexually explicit conduct." (quoting *Ortiz-Graulau v. United States*, 756 F.3d 12, 19 (1st Cir. 2014)), *cert. denied*, 145 S. Ct. 1434 (2025); *United States v. Heinrich*, 57 F.4th 154, 160 (3d Cir. 2023) ("The defendant cannot be a bystander. He must instigate sexually explicit conduct by the child, or by himself or a third party involving the child."). Moreover, Section 2251 does not criminalize an impulsive decision

by either MV3 or Defendant to create a visual depiction. *See United States v. McCauley*, 983 F.3d 690, 696 (4th Cir. 2020) (holding "§ 2251 does not criminalize a spontaneous decision to create a visual depiction in the middle of sexual activity without some sufficient pause or other evidence to demonstrate that the production of child pornography was at least a significant purpose"). As the Fourth Circuit has reminded district courts, it is not enough to "engage in sexual activity with the minor *and* [take] a picture"; rather, a defendant must "engage[] in sexual activity with the minor *to* take a picture." *McCauley*, 983 F.3d at 697 (vacating Section 2251(a) conviction) (emphasis in original); *see also United States v. Palomino-Coronado*, 805 F.3d 127, 132 (4th Cir. 2015) (vacating a Section 2251(a) conviction). Additionally, unlike the factual circumstances with MV2 where the video connection was interrupted, making a conviction for attempt based on intervening circumstance appropriate, here the video link was initiated and proceeded as intended and, other than MV3's nudity, there is no evidence about what specifically occurred during the call. *See United States v. Courtade*, 929 F.3d 186, 191 (4th Cir. 2019) (holding that Section 2251 "requires more than mere nudity"). Accordingly, the Government has not met its burden with respect to this encounter.

On February 17, 2023, Defendant told MV3, "Daddy loves you" as he described "holding you so close on my lap, kissing your lips again and again." GX 102-G. Defendant then told MV3, "I miss you and want to see you so badly." *Id.* In response, MV3 sent a "meet.google.com" video link. *Id.* In this instance, the Government has better evidence of purpose, but this conduct is still not evidence beyond a reasonable doubt. As contrasted with Defendant's encounters with MV2 where Defendant sent the link or specifically instructed MV2 to start the room, here, Defendant drops a hint, but it is MV3 who takes the initiative to send the link. Again, in the aftermath of the video call, it is difficult to discern what happened during the video, which was clearly initiated and

31

fully completed (unlike the attempted connections with MV2 that were foiled by Defendant's laptop and MV2's parents). In this regard, the chats reveal that Defendant described how he "came so hard" and MV3 asserts that she was "still naked," but there is no description of sexually explicit conduct by MV3. GX 102-G. Accordingly, the Government has not met its burden with respect to this encounter.

Similarly, on March 8, 2023, Defendant told MV3, "let Daddy see you," and MV3 then sent a video meet link. GX 102-I. This is similar evidence of purpose as the demand to "see you" could be viewed as a demand for a video call, but this is still not evidence beyond a reasonable doubt of Defendant's purpose to entice, induce, persuade, or coerce such as when Defendant sent MV2 the link or where Defendant instructed MV2 to start the room. *See Palomino-Coronado*, 805 F.3d at 132 (vacating conviction where there "was no evidence that Palomino-Coronado gave any instruction or direction to B.H. *as part of their sexual encounter* that would indicate purpose" (emphasis added)); *McCauley*, 983 F.3d at 696 (holding that "§ 2251(a) does not criminalize a spontaneous decision to create a visual depiction"). Again, in the aftermath of the video call, it is difficult to discern what happened during the video, which was clearly initiated and fully completed (unlike the attempted connections with MV2). Thus, unlike the two instances where Defendant attempted to create videos with MV2 but was interrupted, where the video transmissions with MV3 were clearly completed, the Government cannot rely on attempt to avoid its burden to show beyond a reasonable doubt that the transmissions involved sexually explicit conduct. *Engle*, 676 F.3d at 419 (recognizing that attempt is "a crime distinct from the crime intended by the attempt"). Given the context of the chats and the use of fantasy and imaginary interactions, the Government has not proved beyond a reasonable doubt that when Defendant said, "I love watching you cum so hard for Daddy," or "love watching you touch," he is speaking in

terms of reality rather than fantasy.   Moreover, to the extent the Government relies on the later discussions regarding "squirting," these do not establish beyond a reasonable doubt that Defendant viewed MV3 masturbating in *this* encounter or that he ever actually viewed such a thing in reality. Defendant's description is devoid of information specifically linking such conduct to the particular March 8, 2023 interaction and came after pages of discussions of Defendant's college experience and other matters.   Thus, the Court cannot say that the reference refers to the encounter that had just taken place, rather than some other incident on which the Government has presented no particular evidence.   Accordingly, the Government has not met its burden with respect to this encounter.

In sum, the Government has not met its burden to prove every element of a Section 2251(a) violation with respect to Count 2 and MV3.  Thus, the Court finds Defendant not guilty of Count 2.

### B.      Section 2422(b)

The Court begins by reciting the law applicable to a Section 2422(b) offense, which is applicable to the remaining five counts.  Section 2422(b) provides:  "Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life."  Thus, the Government must prove four elements to obtain a conviction under Section 2422(b): "(1) use of a facility of interstate commerce; (2) to knowingly persuade, induce, entice, or coerce; (3) a person who is younger than eighteen; (4) to engage in an illegal sexual activity." *United States v. Fugit*, 703 F.3d 248, 254

(4th Cir. 2012). The Fourth Circuit has explained that "sexual activity" as used in Section 2422(b) means conduct connected with "active pursuit of libidinal gratification," which need not involve "interpersonal physical contact." *Id.* at 255. The Fourth Circuit has further recognized that Section 2422(b) is intended to "criminalize an intentional attempt to achieve a mental state – a minor's assent." *United States v. Clarke*, 842 F.3d 288, 296 (4th Cir. 2016) (citations omitted). That is, the statute criminalizes the attempt to achieve the minor's assent "regardless of the accused's intentions concerning the actual consummation of sexual activities with the minor." *Engle*, 676 F.3d at 419 (citations and quotations omitted).

At trial, Defendant indicated in opening that "Mr. Bourne is not contesting that the government will be able to meet their burden as to the five enticement counts and he fully expects that the Court will find that the government has proved each count." In closing, Defendant again reiterated that he does not contest the facts to support the elements of the five enticement charges against him. Although the Court notes these statements, the Court does not rely on them in reaching its verdict with respect to Counts 3 through 7.

### i.    Count 3 – MV1

The Court finds beyond a reasonable doubt that MV1 was a person under the age of 18 at the time the chats took place in 2022 and that Defendant had reason to know that MV1 was a minor. GX 100-A (MV1 identified herself as being 13); GX 600. The Court further finds beyond a reasonable doubt that Defendant is the LR Account user and used a facility of interstate commerce – that is, the internet. *United States v. Kaye*, 451 F. Supp. 2d 775, 782 (E.D. Va. 2006) (holding "[a] transmission of communication by means of the telephone or Internet constitutes the use of a facility of interstate commerce"), *aff'd*, 243 F. App'x 763 (4th Cir. 2007). The Court finds beyond a reasonable doubt that Defendant, as the LR Account user, engaged in extensive and

34

graphic sexual discussions with MV1 discussing sexual acts that he would perform on her, sexual acts that she would perform on him, and sexual acts that she would perform on herself and, as part of those discussions, sent MV1 images of his exposed genitals.[26]  The Court finds beyond a reasonable doubt that, by engaging in these chats with MV1, Defendant was knowingly persuading, inducing, enticing, or coercing or attempting to persuade, induce, entice or coerce MV1 to engage in illegal sexual activity.  To wit, the Court finds beyond a reasonable doubt that the sexual conduct in which Defendant solicited MV1 to engage included violations of Virginia Code § 18.2-370 (taking indecent liberties with a child)[27] because Defendant proposed that MV1 feel or fondle her own genital parts, proposed the performance of a sexual act by MV1, and exposed his genitals to MV1.  Accordingly, the Court finds beyond a reasonable doubt that Defendant has violated 18 U.S.C. § 2422(b) and is guilty of Count 3.

---

[26] Those sexual discussions include, but are not limited to the following statements from Defendant: (i) "*peeing on you and getting so hard, wanting to f[***] you now so badly* can I have you?" GX 100-B; (ii) "do you want to suck my c[***] a little to drink down the last of my pee and then have me f[***] you," *id.*; (iii) "re you touching yourself for real? Getting so off?" *id.*; and (iv) "rub your p[***] more for me . . . do as I ask . . . rub it harder . . . feel My [sic] c[ock] so much as you get so turned on sucking me, covered in My [sic] pee," *id.*  Additionally, the LR Account user sent MV1 images of his penis and asked her multiple times, "want to see more?" GX 100-E.

[27] Virginia law prohibits: "Any person 18 years of age or over, who, with lascivious intent, knowingly and intentionally commits any of the following acts with any child under the age of 15 years is guilty of a Class 5 felony: (1) Expose his or her sexual or genital parts to any child to whom such person is not legally married or propose that any such child expose his or her sexual or genital parts to such person; or . . . (3) Propose that any such child feel or fondle his own sexual or genital parts or the sexual or genital parts of such person or propose that such person feel or fondle the sexual or genital parts of any such child; or (4) Propose to such child the performance of an act of sexual intercourse, anal intercourse, cunnilingus, fellatio, or anilingus or any act constituting an offense under § 18.2-361; . . . ." Va. Code § 18.2-370(A).

ii.    Count 4 – MV2

As the Court already determined *supra*, it is clear beyond a reasonable doubt that, at the time the chats took place, MV2 was a minor under the age of 18. *See, e.g.*, GX 601.  The Court further finds that MV2 was 16 and 17 at the time the chats took place and that Defendant had reason to know that MV2 was a minor.[28]  Furthermore, the Court finds beyond a reasonable doubt that Defendant is the LR Account user and used a facility of interstate commerce – that is, the internet. *Kaye*, 451 F. Supp. 2d at 782.  The Court finds beyond a reasonable doubt that Defendant, as the LR Account user, engaged in extensive and graphic sexual discussions with MV2 discussing sexual acts that he would perform on her, sexual acts that she would perform on him, and sexual acts that she would perform on herself and, as part of those discussions, sent MV2 images of his exposed genitals.[29]  The Court finds beyond a reasonable doubt that, by engaging in these chats with MV2, Defendant was knowingly persuading, inducing, enticing, or coercing or attempting to persuade, induce, entice or coerce MV2 to engage in illegal sexual activity.  To wit, the Court finds beyond a reasonable doubt that the sexual conduct in which Defendant solicited MV2 to engage

---

[28] The Court finds that Defendant had reason to know that MV2 was a minor.  MV2 advised Defendant that him having anything depicting her "is technically illegal." GX 101-D. Defendant refers to himself being 37 and "21 years older than you." *Id.*  Defendant also makes clear that he has seen MV2 on video.  GX 101-C; GX 101-D.

[29] Those sexual discussions include, but are not limited to, the following statements from Defendant: (i) that he "like[s] it when you are on cam[era] with Daddy . . . . I like controlling you, guiding your touch, and watching you feel Daddy more than anything and being teased," GX 101-D; (ii) "oh . . . f[***] . . Daddy would like that and would probably want to join you and make love to My [sic] good girl in the bath," GX 101-G; and (iii) "I want to see you as a I touch for you" and "did you cum watching daddy cum," *id.*  It is also clear beyond a reasonable doubt that Defendant exposed his genitals to MV2 as MV2 tells Defendant that she believes his penis "looked about 2 inches long" and, when Defendant objected to this characterization, MV2 states (and Defendant accepts) that "maybe it had to do with the angle of how the camera was." GX 101-G. This is clearly not fantasy, but MV2 describing her observations and Defendant agreeing that perhaps the video of his penis that she viewed did not show him in the best light.

36

included violations of Virginia Code § 18.2-374.3 (use of a communications system to facilitate certain sexual offenses involving children)[30] because Defendant proposed that MV2 fondle her own genitals, proposed performance of an act of sexual intercourse, and exposed his genitals to MV2.[31] Accordingly, the Court finds beyond a reasonable doubt that Defendant has violated 18 U.S.C. § 2422(b) and is guilty of Count 4.

iii.    Count 5 – MV4

This Court finds beyond a reasonable doubt that, at the times of the chat with Defendant, MV4 was a minor under the age of 18. GX 602. Indeed, the Court finds that, at the time of the offenses, MV4 was 14 years old. *Id.* The Court also finds that Defendant had reason to know that MV4 was a minor.[32] Furthermore, the Court finds beyond a reasonable doubt that Defendant is

---

[30] Virginia law prohibits: "any person 18 years of age or older to use a communications system, including computers or computer networks or bulletin boards, or any other electronic means, for the purposes of soliciting, with lascivious intent, any person he knows or has reason to believe is a child younger than 15 years of age to knowingly and intentionally: (1) Expose his sexual or genital parts to any child to whom he is not legally married or propose that any such child expose his sexual or genital parts to such person; (2) Propose that any such child feel or fondle his own sexual or genital parts or the sexual or genital parts of such person or propose that such person feel or fondle the sexual or genital parts of any such child; [or] (3) Propose to such child the performance of an act of sexual intercourse, anal intercourse, cunnilingus, fellatio, or anilingus or any act constituting an offense under § 18.2-361; . . . ." Va. Code § 18.2-374.3(C). Virginia law further prohibits: "Any person who uses a communications system, including computers or computer networks or bulletin boards, or any other electronic means, for the purposes of soliciting, with lascivious intent, any child he knows or has reason to believe is at least 15 years of age but younger than 18 years of age to knowingly and intentionally commit any of the activities listed in subsection C if the person is at least seven years older than the child is guilty of a Class 5 felony." Va. Code § 18.2-374.3.

[31] The Court finds beyond a reasonable doubt that Defendant is more than seven years older than MV2 (who was 16 and 17 at the time), based on the references in the chats to the LR Account user being "37" or "52." Defendant's physical appearance in the courtroom also makes clear that he is more than seven years older than MV2.

[32] In the chats, Defendant refers to having seen MV4. *See* GX 103 at US-00012167 ("can I see you again?"). Defendant refers to MV4 being "so young." *Id.* MV4's mother contacts Defendant and informs him that the chats will be sent to the sheriff's department. *Id.* at US-

37

the LR Account user and used a facility of interstate commerce – that is, the internet. *Kaye*, 451 F. Supp. 2d at 782. The Court finds beyond a reasonable doubt that Defendant, as the LR Account user, engaged in extensive and graphic sexual discussions with MV4 discussing sex acts that he wanted MV4 to perform on him.[33] The Court finds beyond a reasonable doubt that, by engaging in these chats with MV4, Defendant was knowingly persuading, inducing, enticing, or coercing or attempting to persuade, induce, entice or coerce MV4 to engage in illegal sexual activity. To wit, the Court finds beyond a reasonable doubt that the sexual conduct in which Defendant solicited MV4 to engage included violations of Virginia Code § 18.2-374.3 (use of a communications system to facilitate certain sexual offenses involving children), because Defendant proposed that MV4 engage in an act of sexual intercourse. Accordingly, the Court finds beyond a reasonable doubt that Defendant has violated 18 U.S.C. § 2422(b) and is guilty of Count 5.

### iv.    Count 6 – MV5

This Court finds beyond a reasonable doubt that, at the times of the chat with Defendant, MV5 was a minor under the age of 18. GX 603. Indeed, the Court finds that, at the time of the offenses, MV5 was 13 years old and that Defendant had reason to know that MV5 was a minor. *Id.*[34] Furthermore, the Court finds beyond a reasonable doubt that Defendant is the LR Account

---

00012170. MV4 warns him that their chats are "illegal." *Id.* at US-00012188. MV4 refers to herself as a "teen." *Id.* at US-00012189.

[33] Those sexual discussions include, but are not limited to the following statements from Defendant: (i) "only My [sic] c[***] will take your flower . . . you know that right? There is only 1 c[***] allowed in your virgin p[***]. . Master's. Master will be your first and only," GX 103-A; (ii) "did you want to try to please Master quickly?" GX 103-B; (iii) "gripping your hps [sic] and f[******] you so good and deep from behind," GX 103-C; and (iv) "I love f[******] My tight sexy young slave," *id.*

[34] MV5 refers to herself as being in school. GX 104 at US-00012195. MV5 also sends Defendant images of herself where she is clearly a minor. *Id.* at US-00012202 through US-00012206. And MV5 tells Defendant that she is 13. *Id.*

user and used a facility of interstate commerce – that is, the internet. *Kaye*, 451 F. Supp. 2d at 782. The Court finds beyond a reasonable doubt that Defendant, as the LR Account user, engaged in extensive and graphic sexual discussions with MV5 discussing sex acts that he wanted her to perform on herself and on him.[35]  The Court finds beyond a reasonable doubt that, by engaging in these chats with MV5, Defendant was knowingly persuading, inducing, enticing, or coercing or attempting to persuade, induce, entice or coerce MV5 to engage in illegal sexual activity. To wit, the Court finds beyond a reasonable doubt that the sexual conduct in which Defendant solicited MV5 to engage included violations of Virginia Code § 18.2-370 (taking indecent liberties with a child) because Defendant proposed that MV5 fondle her own genitals, proposed performance of an act of sexual intercourse, and proposed that MV5 expose her genitals to him. Accordingly, the Court finds beyond a reasonable doubt that Defendant has violated 18 U.S.C. § 2422(b) and is guilty of Count 6.

### iv.    Count 7 – MV6

Because MV6 is one of the two unidentified persons with whom Defendant communicated, the Government has charged Count 7 as an attempted violation of Section 2242(b). Dkt. 26. In this regard, it is important whether Defendant believed himself to be communicating with and enticing, coercing, persuading, or inducing a minor. *See United States v. Kelly*, 510 F.3d 433, 441 n. 7 (4th Cir. 2007) ("We and other circuits have reached the same connection with 18 U.S.C.

---

[35] Those sexual discussions include, but are not limited to the following statements from the LR Account user: (i) "slipping a finger inside you and pushing it deep, wanting make you even more wet, fingering you softly," GX 104; (ii) "I hope at least you can touch that wet p[****] for real for me as I finger you so gently as you grind on my hand," *id.*; (iii) "are you very wet and rubbing that wet p[****] for me," *id.*; and (iv) "are you rubbing that soft wet p[****]," *id.*

§ 2422(b), which prohibits a person . . ." and have "uniformly rejected the argument that an actual child must be placed at risk to secure a conviction under § 2422(b).").

This Court finds beyond a reasonable doubt that, at the time of the chat with Defendant, Defendant had reason to know and believed that MV6 was a minor. GX 105 (Defendant asking "you are 14" and MV6 responding "yes I am 14").[36] Furthermore, the Court finds beyond a reasonable doubt that Defendant is the LR Account user and used a facility of interstate commerce – that is, the internet. *Kaye*, 451 F. Supp. 2d at 782. The Court finds beyond a reasonable doubt that Defendant, as the LR Account user, engaged in extensive and graphic sexual discussions with MV6 discussing sex acts that he wanted her to perform on herself and on him.[37] The Court finds beyond a reasonable doubt that, by engaging in these chats with MV6, Defendant was knowingly persuading, inducing, enticing, or coercing or attempting to persuade, induce, entice or coerce MV6 to engage in illegal sexual activity. To wit, the Court finds beyond a reasonable doubt that the sexual conduct in which Defendant solicited MV6 to engage included violations of Virginia Code § 18.2-370 (taking indecent liberties with a child), because Defendant proposed that MV6 fondle her own genitals, proposed performance of an act of sexual intercourse, and proposed that MV6 expose her genitals to him. Accordingly, the Court finds beyond a reasonable doubt that Defendant has violated 18 U.S.C. § 2422(b) and is guilty of Count 7.

---

[36] In addition to Defendant's and MV6's statements regarding her age, MV6 also sent Defendant a nude image of the lower half of her body, which confirms that MV6 appeared to be a minor.

[37] Those sexual discussions include, but are not limited to the following statements from the LR Account user: (i) "taking you to bed and starts to f[***] you very passionately, laying you down naked and f[******] your young wet p[****], taking you so deep and hard," GX 105; (ii) "feel me f[******] you so good? Sliding in and out of that tight small p[****] so hard and deep," *id.*; and (iii) "you are not shy to show Sir your soft naked p[****]," *id.*

40

## V.  VERDICT

In accordance with these findings of fact and conclusions of law, the Court FINDS beyond

a reasonable doubt that Defendant Michael Logan Bourne is GUILTY on Counts 1, 3, 4, 5, 6, and

7 of the Indictment and NOT GUILTY on Count 2 of the Indictment.

It is SO ORDERED.

Alexandria, Virginia
December /7, 2025

/s/

Rossie D. Alston, Jr.
United States District Judge

41