IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL LOGAN BOURNE,<br><br>           *Defendant*. | Case No. 1:25-CR-218 (RDA)<br><br>Sentencing: April 15, 2026<br><br>Filed Under Seal Pursuant to<br>18 U.S.C. § 3509(d)(2) |

## <u>POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING</u>

For more than a year, the defendant used a covert Google account – lordromance2021 –
to exploit at least six girls between the ages of 13 and 17, who he referred to as his "slaves" and
who he persuaded to "serve" and "please" him – their "Master" – by engaging in sexually
explicit conduct on live webcams. The defendant groomed the girls, inundating them with
graphic sexual messages and sending two of them pictures of his penis and a video of himself
masturbating. He pushed his victims to reciprocate his sexual advances and to join him on video
calls even when they voiced their discomfort. And he did these things knowing (i) the girls were
minors, (ii) his conduct was illegal, and (iii) the girls were particularly susceptible to him based
on their mental health struggles and past abuse. What's more, despite the overwhelming
evidence presented at trial, the defendant continues to deny responsibility for his crimes and
claims he is not lordromance2021.

The defendant pleaded not guilty to a seven-count Indictment and had a bench trial. He
was convicted of one count of sexual exploitation of MV2, and six counts of coercion and

enticement of MV1, MV4, MV5, and MV6.  Now he comes before the Court for sentencing. The applicable Guidelines range has been correctly calculated in the Presentence Report ("PSR") as Life.  *See* Dkt. 91 ("PSR") ¶128.  For the reasons below, the United States respectfully recommends the Court impose a sentence of 30 years in prison, which is sufficient but not greater than necessary to reflect the totality of the defendant's conduct and comport with the purposes of sentencing set forth in 18 U.S.C. § 3553.

## BACKGROUND

### I.  Factual Background

Between at least February 2022 and April 2023, the defendant used Google Hangouts to entice six minor girls between the ages of 13 and 17[1] to engage in sexual chats and masturbate with him on live video calls.  He sent two victims, MV1 and MV3, pictures of his penis and a video of himself masturbating.  And he received child sexual abuse material from MV5 and MV6.  All the minor victims either told the defendant that they were minors or made other statements indicating that they were children.  And with all the minor victims, the defendant groomed them and enticed them to join him on live video calls for the purpose of watching the minors masturbate and having them watch him masturbate.

---

[1] As discussed in previous filings and based on evidence introduced at trial, the ages and identities of MV1, MV2, MV4, and MV5 were confirmed by law enforcement. MV3 and MV6 each told the defendant they were minors (14 and 17, respectively) but their identities were not confirmed by law enforcement.

**A.  The defendant enticed MV1 to masturbate and join him on a live video call.**

On August 18, 2022, the defendant sent a Google Hangouts message to MV1, then 13 years old, whose Google account was linked to her profile on the online chat site "321chat." Over the course of that day and the next, the defendant sent MV1 numerous sexual messages persuading her to masturbate and to masturbate with him on a live video call.  *See* GX 100 (Google Hangouts Chat with MV1).  For example, the defendant sent MV1 the following:

- "can we cuddle as we chat?"
- "what do you like to do?"
- "how old are you? *holds you closer to me, snuggling you tight against me as we chat*"
- "rub your pussy more for me.."
- "do as I ask..rub it harder"
- "are you alone there? very wet for real?"
- "re you touching yourself for real?"
- "can I see you? as we share so much? on video cam?"
- "did you end up having an orgasm"

During the chat, the defendant sent MV1 pictures of his penis and a video of himself masturbating.  Despite her obvious discomfort, the defendant continued to engage in graphic sexual chats and repeatedly asked MV1 to get on a live video call with him.  For example, on August 18, 2022, the defendant sent MV1 a link to a Google video chat.  MV1 responded, "I'm sorry but I don't think I want to talk with you anymoew [sic]."  She said, "I'm just not in the mood I'm literally sad every day and I'm on the break of tears[.]"  The defendant tried to convince her to join him in the video chat, telling her "we have already shared a lot today and you did smile some today because of me."  She told him she did not "want to talk about stupid sex tho" and the defendant responded, "you said you like to make me hard...so I just thought you would want the opportunity to do just that and earn that praise of being a good girl[.]"  MV1 said, "I tried talking about things in my life you talked about it barely back and went right back to fucking sex[.]"

The following day, the defendant asked MV1, "are you rubbing your pussy right now?" MV1 responded, "not at the moment no[.]"  The defendant said, "do you want to? feel me touching you as I get your pussy ready for my cock? rubbing you and fingering you softly[.]" MV1 said, "Sorry I'm gonna go" and told him "it's just a little overwhelming[.]"  Later, she asked, "Can we talk normal now[?]" The defendant persisted in bringing the chat back to sexual topics, and MV1 asked, "Is it okay if I go?" Ultimately, she told him, "Actually let's not talk your weird.."

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

**B. The defendant sexually exploited MV2 and enticed her to engage in sexually explicit conduct on live video calls.**

The defendant's chats with MV2 spanned April 2022 through April 2023, when MV2 was 16 and 17 years old.  *See* GX 101 (Google Hangouts Chat with MV2).  During this time, the defendant enticed MV2 to masturbate and to masturbate with him on live video calls.  He also discussed with her his fantasy of sexually abusing their fictional children.

For example, on April 22, 2022, MV2 told the defendant "Go to the video call since I just reopened it."  Approximately 25 minutes later, the defendant wrote "back" "goodness" "my heart is still pounding" "I have never felt so connected to anyone..any age" "you look so good

cumming and getting so turned on" "no one has ever made you that wet, and hot have they? Ever?"  Approximately 15 minutes later, the defendant wrote, "I am still so hard for you" "I want to lick your pussy and suck on your nipples and make you so hot" "I have never felt so much with anyone..you are amazing" "you also look like you are very curvy..and I love curves[.]"  A few minutes later, the defendant wrote, "do you want to get on cam very badly and make me even harder?"

Three days later, on April 25, 2022, the defendant sent MV2 another link to a Google Meet video call.  Approximately 50 minutes later, he apologized and said "room completely froze up" because of the laptop he was using.  The defendant then asked her, "do you love daddy['s] cock?"  He said, "daddy is so hard for you" "hate that my laptop lags up so bad..loved seeing you…you look so good for daddy[.]"  Later that day, MV2 wrote, "i am not trying to make this a one sided relationship but if you end up having anything that is technically illegal on your computer phone whatever you use then that could look bad."  The defendant responded, "Morning princess.  1) I do not want you to send me anything..no pictures or anything naughty. That does not do anything for your Daddy.  I like it when you are on cam with Daddy....I like controlling you, guiding your touch and watching you feel Daddy more than anything and being teased."  The defendant told her that her body is beautiful and that he loved her despite their age difference.

On May 2, 2022, the defendant told MV2, "Daddy loves your breasts...and nipples...so mch[.]"  Thirty minutes later, MV2 asked him if he wants to watch her take a bath, and he replied, "oh...fuck..Daddy would like that and probably want to join you and make love to My good girl in the bath but not while daddy is involved in a meeting he has to interact..well, yes..after My meeting..YES[.]"  Later, the defendant indicated his meeting was over, then told

MV2, "start the room, princess." Approximately 30 minutes after MV2 sent a video link, she wrote, "Sorry" "My mom almost caught me since well i am not supposed to have my computer in other rooms besides the living room[.]" The defendant replied, "it's ok" "all I could think about besides breeding you like mad in the tub was our little girl getting into the tub with mommy and sucking on her hard nipples while she slid up and down on daddy's cock in the tub[.]"

On May 6, 2022, MV2 told the defendant she would leave a video call open for him to join when he was done with his meeting. Approximately 1 hour later, the defendant wrote, "I want to see you as I touch for you." Shortly after, MV2 wrote, "My clit is still very sensitive. I wish your cum was in me[.]" The defendant replied, "I do too" "did you love that?" "SO much?" "did you cum watching daddy cum?" A few minutes later, MV2 asked the defendant how big his penis was. She told him it did not look very big, but thought maybe it had to do with the angle of the camera.

In addition to expressing his sexual interest in MV2, the defendant talked to MV2 at length about his fantasies of sexually abusing their fictional children. For example, he told her:

- "I was thinking 12 is a wonderful age to start breeding our little girl...as long as she wants that too...by your side...Daddy taking turns with both of you ❤"

- "and if we have a son too...he can take turns with daddy fucking his sister and mommy...mmmmmm"

- "maybe you and our little girl could be on your knees facing each other making out as you are both fucked by your Daddy and son..mmmmm so hot"

- "feeling her 12 year old tongue devouring you as Daddy fucks her tight bald pussy from behind? losing your mind?"

- "we will raise them in a family full of love and openess and exploration and sexuality and petting an dkissing and more...they will never be afraid of any of that"

6

- "what would be wrong with them wanting to explore mommy and daddy after watching us with each other..IF they wanted to explore...and feel closer to us...why hold them back?"

- "and of course they could play with each other"

- "and we would help them and teach them and show them"

- "we raise them from the start to appreciate us and each other and sexuality and touching and kissing and petting and all of it..not to be afraid of it or that is is some naughty taboo thing...to know mommy and daddy love them and each other and it's very natural to touch and kiss and more"

- "if our 5 year old is in bed with us and wants to touch or kiss or explore, they can...as much as they want...feeling safe and loved always"

- "if you and I are in bed, fucking or making love or enaging in oral sex, anything and any of our kids want to watch or be close or ask questions...we are not going to hide from them or keep them sheltered from that"

- "if you were sucking on me for example and our young little girl wanted to try...we would let her and you would help her so she didn't choke or gag, yes?"

- "no different than if our young son was watching me make love to you and wanted to make love to mommy too...we would encourage that and want him to feel all of mommy's love and attention"

- "our young son..so rock hard...curious and wanting to be inside mommy like daddy is sliding in and out of you"

- "wanting to make mommy feel good like daddy does"

**C. The defendant enticed MV3 to engage in sexually explicit conduct and to join him on live video calls.[2]**

The defendant's relationship with MV3 spanned at least September 2022 through April 2023, though it is clear from their messages that they had communicated before September 2022, too. *See* GX 102 (Google Hangouts Chats with MV3). The defendant's messages with MV3, who purported to be 16 and 17 years old, were extremely graphic. For example, on January 13, 2023, the defendant sent MV3 the following messages in succession:

- "There are 3 things that make Daddy the hardest and happiest when it comes to His good little girl and cam..."
- "seeing her kneeling/sitting properly like a good little girl"
- "watching her squirt"
- "seeing her sucking on daddy[']s cock when she[']s so hungry to please her Daddy and serve Him"
- "(note that Daddy loves seeing His good little girl dressed/naked/anything and He is the luckiest Daddy in the world to get to see such a gorgeous little girl)"

On January 31, 2023, MV3 asked the defendant, "Say if we ever meet.... how and when?"

The defendant responded that he would love to meet her now, and "I don't care how dangerous

---

[2] The defendant was found not guilty of a violation of 18 U.S.C. § 2251 involving MV3. The Court ruled that the government had not met its burden in establishing that the defendant "acted with the purpose of *enticing, coercing, or persuading* MV3 to engage in sexually conduct *on video*" and the evidence did not show "what specifically occurred during the [video] call[s]." Dkt. 86 at 30-31 (Court's Memorandum Opinion and Verdict) (emphasis in original). Nevertheless, the government is including information related to MV3, as Probation did in the PSR, for at least three reasons. First, these messages were admitted at trial, and it is undisputed that they were sent by lordromance2021 to MV3. The defendant's acquittal on this charge turned on the element related to purpose and whether MV3 *actually* engaged in sexually explicit conduct during live video calls, but not whether the defendant groomed this purported minor. Clearly, he did. Second, these facts are properly considered at sentencing as they pertain to the defendant's history and characteristics and the nature of his offenses. *See* 18 U.S.C. § 3553(a). Third, and relatedly, these messages were considered by the Court, among other things, in its determination that the defendant is lordromance2021. Thus, they are properly considered at sentencing. *See* USSG § 1B1.3(c), n.10 (Subsection (c) provides that relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, *unless such conduct establishes, in whole or in part, the instant offense of conviction*) (emphasis added).

8

that would be." The defendant said that he would probably get a hotel room so that he could be alone with her, and he could enjoy time with her in bed and said he would "fuck you quite a bit[.]" The defendant told MV3 she was "the most beautiful teenager I have ever seen," "every inch of you" and added, "dressed and naked[.]"

On February 17, 2023, MV3 sent the defendant a Google Meet link. Approximately 1 hour later, the defendant wrote, "My beautiful sexy amazing princess. That was unreal. Daddy came So hard..had a large mess to clean up..I loved seeing you so much..you are so damn sexy..and all Mine <3[.]" She wrote, "I[']m glad you liked it daddy… did u really?" The defendant wrote, "yes very much" and she responded, "I[']m still naked".

On March 8, 2023, MV3 sent the defendant a link to a Google Meet video call. Approximately 10 minutes later, the defendant wrote that he hoped she did not get in trouble and told her she is so hot. MV3 told him that her door was closed, and he wrote, "I love watching you cum for daddy so much." Later in their conversation, the defendant wrote, "you are special..woah...you aren[']t a guy..you have no idea how hard it is to make a woman squirt...you are the only one...you are insanely special." The defendant told her that he had only seen her squirt once and he could not forget it. He wrote, "you were on the floor..naked..on a towel...my god...it was and has been the hottest and most amazing thing I have ever seen and shared...I think about it andd still cum today." Later, the defendant wrote, "some time soon...would you get naked on cam and get on a towel on the floor and squirt for Daddy..*bites lip*" She replied, "Daddy i actually just did when we first cam idk if I could do another round 😅 😅 " The following day, on March 9, 2023, the defendant wrote, "Did you love watching Daddy cum yesterday?" MV3 replied that she did, and the defendant told her he loved her and her obedience

and submission.  On January 13, 2023, MV3 told the defendant "Its sounds like you're a pedophile 🥺 ."

During their chats, the defendant sent MV3 images of his penis and a video of himself masturbating.

**D. The defendant enticed MV4 to masturbate with him on live video calls.**

The defendant's chats with MV4 spanned February 2022 through March 2023, though as with MV3, it appears they had previously communicated.  *See* GX 103 (Google Hangouts Chat with MV4).  The defendant's first message to MV4, after "Let's chat on Hangouts!" was, "Hello there slave. Master missed you so much. I love you ❤[.]"

During their chats, the defendant sent MV4, then 15 years old, graphic sexual messages and enticed her to join him on live video calls for the purpose of engaging in sexually explicit conduct.  For example, on July 29, 2022, 14 minutes after he sent MV4 a Google Meet video link, the defendant sent MV4 the following messages:

- "you are so fucking hot omg"
- "that soft pussy of yours..damnit so wet"
- "omg I want you so much"
- "fuck you want to serve Master SO badly"
- "Master is SO hard for you"
- "I cannot get over how absolutely beautiful you are..and how sexy....love literally love every single curve on you"
- "you belong to Me..I am never ever letting you go"
- "only My cock will take your flower..you know that right? there is only 1 cock allowed in your virgin pussy..Master's"

10

On July 31, 2022, MV4's account sent a message to lordromance2021 stating, "Hey this her mom. She is not allowed to be on here. She has been talking to about 10 guys giving them the same  ole same ole with them.. The sheriffs dept will be given these conversations as she has stolen someones computer to be on here. She is not allowed to do this sort of thing becausze she stays grounded from every electronic because she gets on these sights and talks to every guy. if you contact her  again the sheriffs dept will be notified and I will press charges[.]"

On August 24, 2022, MV4 appeared to regain control of her Google account and sent a message to the defendant apologizing for her mom's message.  The defendant told her he loved her and would never block her.  He sent her a link to a video call and later asked her if she wanted to try to "please Master quickly."  A few minutes later, he asked her again if they could go "back in the room slave?" then, "*grabs your ponytail and pulls your head back, biting deep into your exposed neck, wanting to make you wet[.]"

On November 7, 2022, MV4 told the defendant that her parents were taking her device away, and their chat communication ended.

### E.  The defendant enticed MV5 to masturbate with him on a live video call.

The defendant's chats with MV5, then 13 years old, occurred over two days in February 2022.  *See* GX 105 (Google Hangouts Chat with MV5).  The defendant's messages were immediately sexual.  The defendant asked MV5, "could I see you on video as I am making you so wet..no sound..before you head off to school?  ❤"  MV5 said she could not do that.  The defendant continued to send her sexual messages, including the following:

- "I hope at least you can touch that wet pussy for real for me as I finger you so gently as you grind on my hand"

- "are you very very wet and rubbing that wet pussy for me? going to cum really hard before you head off to school?  ❤"

- "has anyone taught you how?"

- "are you rubbing that soft wet pussy?"

- "don't stop, feel me touching you....just relax and feel me..feel your body tensing and getting so hot and wet..feel your pussy shaking a ltitle...just let it happen...you will tense and then it will feel SO good and then you will relax"

- "do you like to make someone else smile? does it make you happy when you do?"

- "maybe when you get home from school I can see you and you can see if you can get me to smile"

- "I still want to see you on video sometime...just saying ❤ ❤"

MV5 asked the defendant if he wanted to see a video of her, and he said he would "see one."  MV5 sent the defendant a picture of herself naked in the bathtub.  MV5 told the defendant she was 13, and he responded, "damn..nice pussy and breasts and everytihng for your age" "you are very hot" "I want to fuck that little soft pussy of yours so hard[.]"

**F.  The defendant enticed MV6 to masturbate with him on a live video call.**

The defendant's chats with MV6 spanned at least June 27, 2022, through July 14, 2022. *See* GX 105 (Google Hangouts Chat with MV6).  During these chats, MV6 informed the defendant she was 14 years old.

Throughout the 3 weeks they communicated, the defendant repeatedly attempted to entice MV6 to masturbate with him on a live video call.  For example, on June 27, 2022, the defendant asked MV6, "You want to learn how to serve Me along side My pet, yes?" and "you are willing to be on cam for Sir? You understand your place?"  MV6 said, "Yes sir I do[.]"  A few minutes later, the defendant asked MV6 if she was alone in her room.  She said she was making dinner for her family, and the defendant asked, "After dinner perhaps Sir can see His kitten on cam?"  Later, the defendant asked again if MV6 was alone.  MV6 said she was not, and the defendant replied, "can you be? so I can see you and start to teach you?"  They did not, apparently, get on a video call that night and the following day the defendant sent the message, "if you do not want to do this, just say so..don't jerk me around and lie to me[.]"  MV6 responded, "I got my phone taken my mom lol[.]"  On July 6, 2022, the defendant told MV6, "Sir still hasn't seen you on cam yet kitten" and "can that happen today maybe?"

On July 14, 2022, the defendant tried again to entice MV6 to join him on a video call.  He sent her the following messages:

- "*takes you to bed and starts to fuck you very passionately, laying you down naked and fucking your young wet pussy, taking you so deep and hard*"

- "you are so sexy"

- "feel me fucking you so good?"

- "sliding in and out of that tight small pussy so hard and deep?"

- "can I see you on cam?"

- "❤"

- "you are not so shy to show Sir your soft naked pussy....you want Sir badly, don't you?"

- "you can feel me fucking you so good"

- "so deep"

- "you are very wet and hot arent' you? wanting sir to fuck you more?"

13

- "System message: A call has been attempted from Hangouts. Calls made from Hangouts can't connect with Google Chat. You can share a link to a Meet video call instead."

- "come on kitten...it's time you obeyed and served your Sir...join the call and let me have you..as I fuck you SO deep and hard"

- "❤"

During these chats, MV6 sent the defendant obscene pictures depicting a young girl in various states of undress, as well as a picture of a girl's naked vagina next to what appears to be a stuffed animal.

**G. The defendant chatted, and attempted to chat, with other minor girls online.**

The defendant's lordromance2021 Google account contained records of his chats with other minor girls. For example, on May 4, 2023, the defendant exchanged messages with a Google user who told him they were 16 years old. The defendant said he was 53, "that ok?" The user asked why he was in a teen room, and he replied, "I like younger …not in a nasty way .. just do ….how old are you? *hugs you tight*[.]"

The defendant also sent messages to ("███."). *See* Exhibit 1 (Google Hangouts Chat with ███ ), Exhibit 2 (FBI 302s related to ███.) (all filed under seal). During these chats, which spanned roughly July 2022 through September 2022, ███. told the defendant she was 16 and sent him two videos of herself, one of which showed her exposed breasts. On July 14, 2023, the defendant asked ███., "are you home? in your room?" "could I see you as we talk? Sir would love to see you" "can I set up a google chat room so that I can see you?" ███. initially resisted, and asked if they could do that later, but the defendant told her "you are fine" "do you want to be a good girl for Sir?" ███. said yes, and the defendant responded, "then I will set up a room and you will join me, understand?" The defendant sent ███. a link to a Google video call and told her, "join Sir." Approximately 12 minutes later, the defendant sent ███. the following messages:

- "you are so beautiful"

14

- "I mean that"

- "so pretty and So sexy"

- "love your young figure"

- "and how well you obey Me"

- "you truly are so eager to be a good girl for such an old Sir. ❤"

- "I may not let you go"

- "Sir is going to call you pet and you will kneel at My side and do as you are told always ❤"

## II.    Procedural History

On April 24, 2025, a criminal complaint and arrest warrant were issued charging the defendant with coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b).  Dkt. 1. The defendant was arrested, and on April 29, 2025, he made his initial appearance before the Honorable William E. Fitzpatrick.  After the defendant's arrest, the government filed, and the Court granted, two consent motions to extend the time to indict the case in order to facilitate pre-indictment discovery and discussions of a potential plea resolution.  Dkt. Nos. 21, 23.

On July 24, 2025, a grand jury in the Eastern District of Virginia returned a seven-count Indictment charging the defendant with two counts of sexual exploitation of children, in violation of 18 U.S.C. § 2251(a) and (e), and five counts of coercion and enticement of a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b), related to his offenses against six victims.  Dkt. 26.  The defendant entered a plea of not guilty, and after a bench trial was convicted of offenses against MV1, MV2, MV4, MV5, and MV6.  *See* Dkt. 86.  He was acquitted of a single charge – Count 2/18 U.S.C. § 2251 – related to MV3.  *Id.*

The defendant has been detained since his arrest in April 2025.  The sentencing hearing is currently scheduled for April 15, 2026.

**SENTENCING ANALYSIS**

## I.   Statutory Penalties and Guidelines Calculations

To determine an appropriate sentence, "[a] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Next, "the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id*. Those factors include the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, and avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a).

Although the guidelines are advisory and are only one of the factors listed in § 3553(a), they assist the Court by "provid[ing] certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *United States v. Booker*, 543 U.S. 200, 264 (2005) (internal quotation marks and citations omitted). Indeed, in the ordinary case, there will be a significant amount of overlap between the guidelines range and the remaining § 3553(a) factors, because the guidelines "reflect a rough approximation that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, although the guidelines are not mandatory, they remain "the starting point and the initial benchmark" in ensuring fair and just sentencing both for defendants, individually, and across multiple cases, collectively. *Gall v. United States*, 552 U.S. 38, 49 (2007). Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

The U.S. Probation Office prepared a PSR containing the defendant's Guidelines calculation. As explained in the PSR, the Guidelines were first calculated in separate groups for

each victim.  PSR ¶¶ 46-84.  A multiple count adjustment, plus a 5-level increase for repeat and dangerous sex offender, results in a combined adjusted offense level of 47.  *Id.* ¶¶ 85-89. Pursuant to USSG Chapter 5, Part A, comment. (n. 2), "[a]n offense level of more than 43 is to be treated as an offense level of 43."  Therefore, based on a total offense level of 43 and a Criminal History Category I, the defendant's Guidelines range is Life.  *Id.* at ¶¶ 127-128.

The defendant submitted several objections to the Guidelines calculation, which are discussed below, however, as the defendant concedes and Probation confirmed in the updated PSR, even if the Court were to sustain his objections, the Guidelines would still be life.  *Id*. at 33.

## II.   Objections to the PSR

The defendant submitted a letter to Probation dated March 2, 2026, raising several objections to the PSR, including objections to the factual description of the offense conduct, any inclusion of facts related to MV3, a two-level enhancement for MV2, MV4, MV5, and MV6 for commission of a sexual act or sexual contact, and a two-level enhancement for MV1 being a vulnerable victim.  The government responded to the defendant's objections and its responses are included in the updated PSR on pages 29-33.  The government hereby incorporates those responses in this memorandum and for the reasons cited therein, the defendant's objections should be overruled.

The defendant also requested factual corrections to his personal and family history, as detailed in the PSR.  It appears those changes have been made.

## III.   Section 3553(a) Factors

The United States believes that a sentence of 30 years' imprisonment and a lifetime term of supervised release is sufficient but not greater than necessary to reflect the totality of the defendant's conduct and comport with the purposes of sentencing set forth in 18 U.S.C. § 3553.

17

**A. The nature, circumstances, and seriousness of the defendant's offense.**

The defendant is every parent's nightmare. He used a messaging application to prey on vulnerable children, whom he enticed to masturbate with him on live video calls. Even when some of the victims expressed reluctance and discomfort, the defendant plowed ahead, bombarding them with messages meant to convince them to join him, to ascertain when they would be alone, and generally to weaken their resistance. Worse still, several of the victims told the defendant they suffered from serious mental health issues, felt suicidal, engaged in cutting, had been previously sexually abused, and lived in unstable family situations. His exploitation of these vulnerable girls, who were already vulnerable based on their age alone, is unconscionable. His singular concern was for his own sexual gratification, whatever the cost.

The defendant's crimes were not the product of a momentary lapse of judgment, but rather a calculated effort to deceive minors into believing that he was someone who cared about them so he could get what he truly wanted – child sexual abuse material, live on camera. He did this with multiple girls, over the course of at least 14 months, though likely longer than that. And the harm that the defendant has caused cannot be overstated. In her letter to the Court, ███. wrote about how the defendant took away her innocence and her sense of safety. She said she struggles with trusting people and believing that someone's kindness is real.

Indeed, children who are victimized through the production of child sexual abuse material "undeniably suffer serious harm when they are used to create this type of material." *United States v. Wellman*, 663 F.3d 224, 232 (4th Cir. 2011). Quite simply, "sexual abuse is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional, and sexual development in ways which no just or humane society can tolerate." *Kennedy v. Louisiana*, 554 U.S. 407, 468 (2008) (Alito, J., dissenting) (quotation marks omitted). Through

his crimes, the defendant has harmed young girls who will no doubt suffer severe psychological and emotional damage as a result.

The nature and seriousness of the defendant's crimes weigh in favor of a 30-year sentence.

## B.  The Defendant's History and Characteristics

According to the defendant, he was raised by a loving mother, received an excellent education, and enjoyed a "stable upbringing."  *See* PSR ¶¶ 98-106 (Personal and Family Data). The defendant described his childhood as "positive" and said he has "fond childhood memories." The defendant had the good fortune to attend college and graduate school, on full scholarships no less, and ultimately earned a Bachelor of Science degree and a Master of Science degree.  *Id.* ¶111.  After college, he married his wife, with whom he has 3 adult children.  *Id.* ¶ 102.  He reported steady employment upon completion of graduate school and earned a substantial salary prior to his arrest.  *Id.* ¶¶ 112-124.  He also reported that he has never had any issues with alcohol or other substances, and, until his incarceration, enjoyed good physical health.  *Id.* ¶¶ 107-110. He has no reported mental health issues.  *Id.*

Despite the defendant's education, good health, family support, and financial resources, he chose—repeatedly—to victimize children.  He was not lured or coerced through unfortunate life circumstances to a life of crime.  Rather, he raced down the path of his own volition and with full knowledge of the wrongness of his actions.

The defendant chose to commit these crimes, knowing full well that his conduct was harmful and illegal, yet choosing to do it anyway.  His sentence should reflect those facts.

### C. The need for the Sentence Imposed to Afford Adequate Deterrence and Protect the Public

Both specific and general deterrence call for a significant sentence in this case. With respect to specific deterrence, the risk the defendant poses to children is immense. The defendant engaged repeatedly in sexual chats with minors, wherein he persuaded them to engage in sexually explicit video calls, exposed his genitals to them, and enticed them to masturbate and expose themselves to him. The defendant knew his victims were children and fantasized in the chats about sexually abusing children together. The defendant attempted to conceal his conduct by using a throwaway email account and fake name. He was careful in how he sent pictures to the minors, and he concealed his activity from his wife and children. The defendant engaged in this conduct for at least 14 months, but in all likelihood much longer than that, given the allusion in some of his chats to longer relationships. Indeed, had MV1's parent not reported her chats to law enforcement, it is unclear when, if ever, the defendant's crimes would have been uncovered. As the Supreme Court has noted, there are "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." *Smith v. Doe*, 538 U.S. 84, 103 (2003). The sentence imposed must therefore protect the public and account for the specific danger the defendant poses to children.

Here, a 30-year sentence would adequately protect children from the defendant's future crimes. The defendant is sexually attracted to children and not afraid to act on that attraction. He victimized multiple girls online and expressed, in graphic terms, his interest in sexually abusing his fictional children with MV2. He was completely undeterred from this illegal activity even when it appeared MV4's mother would report his conduct to law enforcement. After MV4's mother warned him she would report him to the Sheriff's Department, the defendant still had sexual chats with MV4 and tried to persuade her to get on a video call with him. And, when

20

MV2 expressed concern that the defendant might have something "illegal" on his computer, the defendant was unperturbed, telling her he "like[s] it when you are on cam with Daddy....I like controlling you, guiding your touch and watching you feel Daddy more than anything and being teased[.]"  His chats with MV2 continued for almost a year after that.

No matter his age, if the defendant has access to a phone or a computer he will still be fully capable of committing the same crimes that he committed in this case.  In fact, "[s]tudies and reports in this field are consistent with what judicial decisions show: pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat." *United States v. Irey*, 612 F.3d 1160, 1214 (11th Cir. 2010) (citing various studies and reports); *see also United States v. Allison*, 447 F.3d 402, 405–06 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders.").  A sentence of 30 years would protect the most vulnerable members of society— namely, children—from the defendant's conduct.

General deterrence, too, is especially important in cases like this one, where the defendant used an online messaging platform to groom and exploit children.  Put simply, online sexual exploitation of children is an epidemic.  In fact, the National Center for Missing and Exploited Children ("NCMEC") reports a more than 300% increase in the number of online enticement reports between 2021 and 2023.  *See* "Online Enticement" available at: https://ncmec.org/theissues/onlineenticement#bythenumbers.  NCMEC reports that in 2023, the CyberTipline received more than 186,800 reports of online enticement.  *Id.*  Compare that with NCMEC's 2024 figures – 456,000 reports of online enticement – and the 2025 figures – 518,720 reports made between just January 1 and June 30.  *See* Patricia Davis, "Spike in online crimes

against children a 'wake-up call'" Sept. 4, 2025, available at:

https://www.missingkids.org/blog/2025/spike-in-online-crimes-against-children-a-wake-up-call.

Disturbingly, "[a] new study from researchers at the Georgia State University School of Public Health and the Childlight Global Child Safety Institute estimates that one in 12 children worldwide have been subjected to online child sexual exploitation or abuse." Sam Fahmy, "Study Estimates 1 in 12 Children Subjected to Online Sexual Exploitation or Abuse," Jan. 22, 2025, available at: https://news.gsu.edu/2025/01/22/study-estimates-1-in-12-children-subjected-to-online-sexual-exploitation-or-abuse/. "Rapid advancements in digital technology and the growth of internet and smartphone access, particularly in developing nations, are putting more children at risk every day[.]" Madeline Holcombe, "Children are sexually abused online regularly, and the problem is only growing. Here's what experts suggest," Jan. 21, 2025, available at: https://www.cnn.com/2025/01/21/health/children-online-sexual-abuse-wellness. "The internet has become a crime scene, with children sexually exploited and abused online about ten times every second. It's a global health emergency linked to poorer mental and physical health, reduced employment prospects and lower life expectancy[.]" *Id.*

The need for effective deterrence through a serious sentence is essential to make it clear to offenders, like the defendant, who groom and exploit children online, that the penalties for these crimes are steep. A sentence of 30 years would accomplish that aim.

## IV. Supervised Release

The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release … is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Under 18 U.S.C. §

3583(k), the authorized term of supervised release for the defendant's crimes is at least five years and up to life. This five-year mandatory minimum term reflects a heightened concern for recidivism among sex offenders and the need for supervision over time. *See* H.R. Rep. No. 107–527 at 2 (2002) (explaining that "studies have shown that sex offenders are four times more likely than other violent criminals to recommit their crimes" and that "the recidivism rates do not appreciably decline as offenders age"); H.R. Conf. Rep. No. 108-66 at 49–50 (2003). Notably, the Guidelines recommend a lifetime term of supervised release for sex offenders, U.S.S.G. § 5D1.2(b) (Policy Statement), which courts have observed "reflects the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public." *United States v. Morace*, 594 F.3d 340, 351 (4th Cir. 2010) (quotation marks and citation omitted).

Based on an assessment of these factors, the United States recommends that the Court impose a lifetime of supervised release with the conditions of supervision described in 18 U.S.C. § 3583(d) for felons required to register under the Sex Offender Registration and Notification Act and those described in U.S.S.G. § 5D1.3(d)(7) for sex offenders. Given the length of time the defendant engaged in the offense conduct, the number of victims, and the seriousness of his crimes, a lifetime term of supervision is appropriate to limit his capacity to reoffend and provide him with steady access to the treatment and monitoring he clearly requires.

## V.    The Amy, Vicky, and Andy Child Pornography Victim Assistance Act (AVAA)

On December 7, 2018, Congress enacted the Amy, Vicky, and Andy Child Pornography Victim Assistance Act. The Act instructs that, in addition to any restitution or other special assessment, courts "shall assess . . . not more than $50,000 on any person convicted of a child pornography production offense." 18 U.S.C. §§ 2259A(a)(3). Assessments collected under this

23

statute are deposited in the Child Pornography Victims Reserve, which provides monetary assistance to victims of trafficking in child pornography, *see* §§ 2259(d) & 2259B, and shall be paid in full after any special assessment under § 3013 and any restitution to victims of the defendant's offenses, *see* § 2259A(d)(2).  In determining the amount to be assessed under § 2259A, courts should consider the sentencing factors set forth in § 3553(a) and the guidance in § 3572 for the imposition of fines. § 2259A(c).  The United States respectfully requests that the Court impose a reasonable special assessment under § 2259A, in addition to the $600 mandatory special assessment for his felony convictions pursuant to 18 U.S.C. § 3013.

## VI.    Restitution

The government has not received any restitution requests in this case.

## VII.    Forfeiture

The government is seeking an order of forfeiture of the defendant's HP Stream Laptop (SN 5CD9290NFQ) and iPhone 15 Pro Max (SN FGCW36VR9N).  A proposed consent order of forfeiture has been provided to defense counsel for her review.

**CONCLUSION**

For the reasons stated herein, and such others as the United States may raise at sentencing, the United States requests that this Court sentence the defendant to 30 years of imprisonment and a lifetime of supervised release.

Respectfully submitted,

Date: April 8, 2026                    By:    _____/s/_____
                                              Lauren Halper
                                              Vanessa Strobbe
                                              Assistant United States Attorneys
                                              United States Attorney's Office
                                              2100 Jamieson Avenue
                                              Alexandria, Virginia 22314
                                              Phone: (703) 299-3700
                                              Fax: (703) 299-3980
                                              Email: Lauren.Halper@usdoj.gov
                                              Email: Vanessa.Strobbe@usdoj.gov